INSURANCE COMPANY *v.* YOUNG'S ADMINISTRATOR.

A., of San Francisco, aged twenty-six, applied, on the 5th of June, 1867, to the agent there of a New York life insurance company to insure his life, the money to be payable "at forty-five, or death," and the policy to take effect from date of the application. The agent acknowledged the receipt of $99.30 as the first quarterly premium, with a proviso that "said application shall be accepted by the company; but should the same be declined or rejected by said company, then the full amount paid by A. will be returned to the applicant on the production of this receipt." In fact A. did not pay any money at this time, but only gave a promissory note for the $99.30, which note he never, at any time, paid.

Upon the trial, the court below (to which the case was submitted without the intervention of a jury, under the act of March 3d, 1865, which enacts that the court may, by agreement of parties, find the facts, and that the finding shall have "the same effect as the finding of a jury"), found, as a fact, that the company "accepted" the application and sent a policy to its agent; "but that the policy did not in terms agree with the memorandum as to date and time of payment." The policy sent made the quarterly payment $96.60 (a difference in A.'s favor), and the policy was antedated so as to run from the 5th day of April, 1867; a day which the policy showed was the applicant's birthday. This variation was of course against his interest. Accompanying the policy sent to the agent were two receipts for premiums, executed by the company in New York, one as of the *5th of April*, 1867, and the other as of the *5th of July*, 1867, under which receipt was a "Notice to policyholders," that unless premiums were paid on or before the day they became due, the policy was forfeited and void; that agents were not authorized to make, alter, or discharge contracts, or waive forfeitures; that payments of premiums to agents were not valid unless receipts were given, signed in New York by the officers of the company, the local agents to countersign them as evidence of payment; and that all premiums were payable in New York. The policy and these receipts reached the agent at San Francisco on the 2d of August, having been executed in New York, probably twenty-three to thirty days before. The agent countersigned them, and on the 8th (six days after receiving it) wrote to A., then absent from home, informing him that his policy had arrived, and asking whether he would have it sent to him or held subject to his order. It did not appear whether A. received or did not receive the letter. On the 21st of August he was shot (becoming at once insensible), and died on the 20th of September. *Held*, that owing to the change of terms in the policy from those contemplated by A., the applicant, the acceptance by the company was a qualified acceptance which A. was not bound to accept; that there having been no evidence that he did accept it the company was not bound.

ERROR to the Circuit Court for the District of California, in which court the administrator of McPherson Young, of San Francisco, sued the Mutual Life Insurance Company of New York (a company incorporated by the State of New York but having a general agent, one H. S. Homans, at San Francisco, and an office there for the transaction of life insurance business) to recover $5000, which the administrator alleged had been insured by the said company on the life of his decedent and not paid.

The case was submitted to the court under the act of

March 3d, 1865, without the intervention of a jury.   This act enacts that parties may submit issues of fact in civil cases in this way; that the finding of the facts by the court may be general or special, "and shall have the same effect as the verdict of a jury."   And it adds that "when the finding is special the review may extend to the determination of the sufficiency of the facts to support the judgment."

The case, as found by the court was thus:

On the *5th of June*, 1867, the said McPherson Young made application to the said Homans, general agent as aforesaid, for an insurance of $5000 on his life, and thereupon entered into a contract with Homans, as such general agent, in these words:

"THE MUTUAL LIFE INSURANCE COMPANY OF NEW YORK.

"Received, San Francisco, June 5th, 1867, from McPherson Young, of San Francisco, California, $99.30, being the first quarter-annual premium on his application for a policy of insurance of the Mutual Life Insurance Company of New York, for the sum of $5000 on the life of said Young, payable at forty-five or death, and premiums paid up in full in ten years; said policy of insurance to take effect and be in force *from and after the date hereof*, provided *that said application shall be accepted by the said company;* but should the same be *declined* or rejected by said company, then the full amount hereby paid will be returned to said applicant upon the production of this receipt.

" For the Mutual Life Insurance Company,

" H. S. HOMANS,
" General Agent for the Pacific Coast."

The finding of the court proceeded:

" The application of the said Young was transmitted to the said company, and *was by them accepted;* and a policy was made out, signed, sealed, and transmitted to the general agent, who received the same about the 2d of August, 1867.   *But the policy did not in terms agree with the memorandum as to date and time of payment.*"

The $99.30 mentioned in this receipt were not paid in money; Young simply gave his note for the amount, pay-

able to Homans, personally, at sixty days, which note was never paid.

By the terms of the receipt, as the reader will have noted, the policy contracted for was to take effect and be in force from the date of the receipt, that is to say, from the *5th of June*, 1867. The quarterly payments would thus, of course, have been to be made on the 5th of September and the 5th of December, 1867, and on the 5th of March and the 5th of June, 1868, and so on till the ten years had expired or death had supervened. The quarterly payments, too, were to be $99.30.

The policy as issued differed from that contemplated by the receipt, in these particulars:

1st. It bore date the *5th of April*, 1867, and instead of being made to take effect from the 5th of June, was made to take effect from the said preceding 5th of April.

2d. The quarterly payments were to be $96.60 instead of $99.30.

3d. The days of payment during the ten years were to be the 6th days of April, July, October, and January, instead of the 5th days of June, September, December, and March.

The policy, in which Young's age was stated to be twenty-six years, witnessed that "in consideration of the representations made and of the sum of $96.60, to them *duly paid* by McPherson Young, and of the quarter-annual *payment* of a like amount on or before the 6th days of April, July, October, and January, in every year during the continuance of the policy, the company agreed to pay the said amount of $5000 to the said McPherson Young or his assigns, *on the 6th of April*, 1886, *when the above-named person, whose life i. hereby insured, shall have attained the age of forty-five years;* or, should he die previous to attaining that age, in sixty days after the notice and proof of his death, to his executors, administrators, or assigns; the balance of the year's premium, if any, being first deducted therefrom."

The policy contained a provision, that—

"If the said premiums shall not be *paid on or before the days above mentioned* for the payment thereof, . . . then in every such

case the company shall not be liable for the payment of the sum assured, or any part thereof, and this policy shall cease and determine."

At the date of these transactions, the time required to go from New York to San Francisco—there being then no overland route—was from twenty-three to thirty days.

The policy after being executed was transmitted by the company in New York to Homans at San Francisco, where it arrived on the 2d of August, 1867. With the policy were transmitted and received two receipts for premiums, assumed to be due April 6th, 1867, and July 6th, 1867, signed by one W. Stewart, secretary of the company in New York; one of them, the one for the April premium, will show the form. It was thus:

"THE MUTUAL LIFE INSURANCE COMPANY OF NEW YORK.

"BROADWAY AND LIBERTY STREET, NEW YORK,
"April 6th, 1867.

"Received from McPherson Young $96.60 for the quarter-annual premium on policy No. 65,733, due the 6th of April, 1867. For terms of mutual agreement, see *application* and policy.

"WILLIAM STEWART,
"Secretary.

"Countersigned at ———.
"H. S. HOMANS,
"Agent."

On this receipt, as on that for the July premium, was affixed, on the 2d of August, 1867, by the agent, Homans, a cancelled revenue stamp, and the receipts were counter-signed by Homans, as indicated in the copy of the one above given.

To both the receipts was annexed a document, thus:

"NOTICE TO POLICY-HOLDERS.

"The agreement is mutual (see *application* and policy), that unless the premium is paid on or before the day it becomes due the policy is forfeited and void. Agents are not authorized to make, alter, or discharge contracts or waive forfeitures. Payments of premiums to agents are not valid unless receipts be given signed by the president, secretary, cashier, or actuary.

When receipts are sent to agents for delivery, *such agents shall countersign the same as evidence of payment to them. All premiums are due and payable at the office in New York.* For the convenience of the assured they may be made to an agent, but only upon the production of the receipt above specified.

"F. S. WINSTON.<br>"President."

On the 8th of August, 1867, that is to say, *six days* after the policy was received by the agent, Homans, he wrote to Young, addressing him at Vallejo, California, as follows:

"SAN FRANCISCO, August 8th, 1867.

"MCPHERSON YOUNG, ESQ.,
      " Vallejo, California.

"DEAR SIR: Your policy of insurance with the Mutual Life Insurance Company has arrived. Please inform me whether I shall send it to you at Vallejo, or if you will call and get it when you are in the city.

"H. S. HOMANS,<br>"General Agent."

The case, as found, continued:

" But whether said note was delivered to or received by said Young, or when forwarded, and in what manner, does not appear from the evidence. No notice of *the acceptance* of said application, or of the issue and arrival of the said policy is shown to have been delivered to or received by said Young, nor was any demand made upon him for further payment, nor any receipt or notice requiring payment presented to him."

Young was shot at Vallejo on the 21st of August, 1867;* and removed on the next day to an hospital in San Francisco, where he died on the 20th of September following; having, from the time that he was shot, been physically and mentally unable to attend to any business. After his death, the agent wrote " Cancel; dead," on the policy, and sent it with the two receipts of April 6th and July 6th for premium, attached to the policy and uncancelled, and the note for $99.30,

---

* The shooting was stated, in the opinion of the court below, to have been accidental.

which Young had given to the agent June 5th, 1867, to the office in New York, where the officers, on the 21st of October, cancelled the policy by tearing off the seal and cutting out the name of the president. The note for the $99.30 remained in the company's hands unpaid, but was never surrendered or offered to be surrendered to Young. The word "cancelled" was written across its face in lead, but by whom did not appear. No subsequent premium was ever demanded by the company or paid.

Administration having been granted on the estate of Young, the administrator sued the company.

The declaration alleged that on the *5th of June*, A.D. 1867, the company caused to be made a policy of assurance, purporting that, in the consideration of $99.30, then paid, being the first quarterly annual premium for the sum of $5000 of the life of McPherson Young, payable at forty-five or death, and *his promise and undertaking* to continue to pay thereafter to the said company, the defendant, like quarterly payments of $99.30 during the term of ten years thereafter, if he should so long live, they did assure, and agree, to and with the said McPherson, that they would pay unto him, upon his attaining the age of forty-five years, or to his executors, administrators, or assigns, in case he should die before attaining that age, the sum of $5000. And that the said McPherson, in all things, performed the agreement, and all the conditions and promises which by the terms of the said policy were by him to be performed.

The defendant pleaded the general issue, and also two special pleas:

1st. That the policy was issued and delivered to the deceased *on the 6th of April*, 1867; that the premium therein agreed to be paid was not paid, and had never been paid; and that by the rules of the company, of which the decedent had full knowledge, this non-payment operated as a forfeiture.

2d. That another premium, the second, came due *July 6th*, 1867, that this had not been paid, and that the non-payment operated as a forfeiture, &c., all as before.

The court below gave judgment against the company, and the company now brought the case here.

*Mr. W. D. Davidge, for the company, plaintiff in error:*

I. *The finding of the court does not sustain the contract set out in the declaration, and upon which issue was joined.*

The court found no such remarkable contract as is alleged in the declaration; a contract whereby a party is insured in the sum of $5000, in consideration of $99.30 paid, and his *promise* to make similar quarterly payments; nor indeed is there any contract of insurance at all found.

The court did find that the application was accepted; and if such acceptance, accompanied, as it was, by the act of transmitting a policy different from that applied for, constituted in law an absolute, instead of a qualified acceptance, then there was found a contract to insure. But a contract to insure is not a contract of insurance. Still less is a contract to insure in consideration of the *payment* of quarterly premiums of $99.30 for ten years, a contract of insurance, in consideration of the payment of the first quarterly premium of $99.30, and the *promise* of the assured to make other similar quarterly payments during the ten years.

The question presented is not one of mere variance. It is not that the policy declared on was misdescribed, but that the finding shows there never was any policy at all; and, more than this, the declaration alleges a policy with conditions, and avers that such conditions were performed by the assured. The finding does not show what were the conditions, nor that they were performed; and even if it be assumed that a contract to insure, specially found, would sustain an averment of a policy of insurance, still the allegation that there were conditions, and that they were performed, would have to be found, otherwise the plaintiff would be absolved from performance of the conditions.

It is admitted that, upon a contract to insure, the assured has a remedy by action at law, as well as by bill in equity,*

---

* Commercial Mutual Marine Insurance Company *v.* Union Marine Insurance Company, 19 Howard, 318, 323.

but it is maintained that, in such action, the plaintiff must show the conditions of the policy contracted for, and that the loss claimed would be recoverable under them. He must give the same evidence of compliance with such conditions as if the action was founded on the policy itself, and is not to be discharged from them, because he is suing upon a contract to issue a policy instead of the policy.

II. *The finding does not show any liability on the part of the company.*

1. If the acceptance of the application and transmission of the policy be taken together, they show, as was doubtless the case, a *qualified* acceptance of the proposal to insure. The only overt act found is the transmission of the policy; and the acceptance of a proposal consists in some overt act intended to signify to the other party such acceptance. The overt act may be by words spoken, or mailing a letter, or otherwise, but, whatever the form, until such act there is no *aggregatio mentium*.*

Here the overt act was not, in essential particulars, in accordance with the terms of the offer. The policy differed to the disadvantage of Young from the application in respect of date, from which the policy was to take effect, and the time for making payment of premium. Instead of making the policy begin June 5th, 1867, it made it begin two months earlier, so a second premium came due two months before the time that Young proposed. The loss to the applicant by this change is obvious, and needs no comment. The policy was not then an unqualified assent to the terms of the application. The minds of the parties did not meet, and there was no contract, and indeed none is found by the court below. Certainly Young was not bound to accept the policy. The company could not, after tender of it, have maintained an action to recover the amount of the note, but he had a complete defence in the fact that the policy differed substantially from the application, and the

* Tayloe *v.* Merchants' Fire Insurance Company, 9 Howard, 390; Hallock *v.* The Commercial Insurance Company, 2 Dutcher, 268; Heiman *v.* Phœnix Insurance Company, 17 Minnesota, 153.

magnitude and effect of that difference were matters for him to decide.*

If he was not bound, neither was the company.

2. If the acceptance found be dislocated from the overt act, without which in some shape there can be no assent to a proposal, how then stands the case?

The terms of the application are not found. It is only by inference that the conclusion is reached that they were the terms mentioned in the receipt. But the case is that of a special verdict, and in a special verdict the court can intend nothing. It is the province of the jury, or the court discharging the office of the jury, to draw inferences. Neither the court below as a tribunal of law, nor this court can draw them. But waiving this objection it is apparent that the subject-matter of the application was a policy of insurance, and the law would presume a policy on the usual conditions. But what were these conditions? The finding is silent. That there were conditions is admitted by the declaration. But what were they?

Waiving too this difficulty, let it be inferred that the policy found by the court contained the usual conditions, as doubtless it did. What then? Why then the policy to which the applicant was entitled under the contract assumed to have been made contained the condition that the policy should cease and determine in the event of non-payment of premiums. By the very contract assumed then it was a condition, that the regular quarterly annual premiums should be punctually paid, and those premiums were payable on the 5th days of June, September, December, and March. Were the premiums of the 5th of June and 5th of September paid? Plainly not. For the first, the note was given but never paid. As to the September premium, no further attention was paid to it by the applicant than if the assumed contract had never been made.

If the assumed contract ever existed, it arose when the application was accepted. It matters not whether the appli-

---

* Eliason *v.* Henshaw, 4 Wheaton, 225.

cant knew of the acceptance or not. He knew of his offer, and that such offer would, upon acceptance, ripen into a contract, and that such contract must devolve upon him certain obligations. He is presumed to have known the law and the character of the policy for which he had applied.

The applicant then failed to pay the note given in anticipation of the first premium, and also the second premium. The fact of non-payment of the first note is established by the finding.

Even if there was no default in the payment of the first premium, there certainly was in that due the 5th of September.

The condition as to payment of premium in both the assumed contract and that evidenced by the policy is the same.

This condition is plainly a condition precedent. The payment of the premium is explicitly declared to be indispensable to the continuance of the contract, or, in other words, such payment is a condition precedent.

In *Ruse* v. *Mutual Life Insurance Company*,* the provision of the policy, as to the payment of premiums during the continuance of the policy, was almost identical with that in the present case. It was held that such a provision created a condition precedent, without performance of which the plaintiff could not recover, and to the same effect is the later case of *Howell* v. *The Knickerbocker Life Insurance Company*,† where performance was rendered impossible by the act of God; the assured intending to pay the premium but being prevented by an attack of apoplexy two hours before the policy expired. But we need not cite cases to prove settled law.

*Messrs. Henry Beard and William Todd Otto, contra:*

The questions to be decided arise upon a case found by the court below; a case in the exact nature and with the exact effect of a special verdict: where, as the opposing counsel say, this court cannot draw inferences.

* 23 New York, 516.                       † 44 Id. 276.

This finding or special verdict—the case—shows:

1. That on the 5th June, 1867, Homans, agent of the New York company, received from Young his note of $99.30, as the first quarterly premium on an application by Young to the company for a policy for $5000 on his own life, payable at forty-five or death, and premiums paid up in full for ten years; and that it was then agreed between Young and the agent of the company that such a policy, from the company, should take effect and be in force from the said 5th of June, provided that the application should be accepted by the company; but that if it should be declined or rejected by the company then that the note should be returned.

The case shows with equal distinctness, and by an express finding,

2. That the application of the said Young was transmitted to the said company and was not declined nor rejected, but that it was by them "accepted," and that a policy in response to the application was made out, signed, sealed, and transmitted to the general agent, who received it, and informed Young that it was awaiting him.

The finding that the application was "accepted" by the company is a finding of a fact. There is nothing to show that an acceptance is found by the court because a policy was transmitted for the applicant. To infer an acceptance from that cause would be to make a conclusion of law, and not to find a fact; which alone, in this part of the case, it was the court's duty to find. There was doubtless evidence, independent of the transmission of the policy, to show an acceptance.

Now, in point of fact, it cannot be doubted that the company meant the policy sent to be, not a rejection of the proposition made, and another proposition; nor, in truth, a *qualified* acceptance of anything, but to be a substantial compliance with the proposition; a compliance more favorable, if anything, to the applicant than would have been a literal compliance. For though the policy sent did differ in dates and premiums from the offer made, the result of the difference was practically small, and might prove a gain to Young.

So far as the *amount* of premium offered was concerned, Young was plainly a gainer.   He offered $99.30.   The company took $96.60.   The agent had doubtless miscalculated the value of the life.   *He* asked more than the company's rates required.   Had Young paid for ten years, which at the age of twenty-six it seemed probable that he would do, the difference would have been $108, pure gain to him.   Then, on the other side, the company made the risk begin two months before Young did.   The reason is obvious; for the policy shows that Young's birthday was the 5th of April, and the payment became due on his arriving at the age of forty-five; and doubtless in order to facilitate calculation that day was taken.   The change caused Young to pay two-thirds of $96.30, that is to say, $64.20 more than he offered. So that as undoubtedly the company hoped that Young would live for the whole ten years during which premium was to be paid, and as of course Young expected to do the same, we have a case where on both sides the policy was meant to be in substance what was asked for.   Indeed, in a certain result, that is to say, if Young died on a certain dáy, the result might be *exactly* the same as would have been a literal compliance.

The opposing counsel, however, consider that the offer made by Young was in fact and form and substance rejected, as one that the company's interest required it to reject; and that a new proposition, one more favorable to its own interest, was offered; and, so far as the company was concerned, accepted in advance.   They treat the differences between the proposition and the policy as wide—substantial—and for the sake of the argument we shall now in what we have to say so regard them.

We set out then on the assumption—one which there is then no evading or avoiding—that the company did, as matter of fact, " accept," Young's proposition, as made.

Opposing counsel speak of a " *qualified* acceptance " as the acceptance which was made.   But this is their language; not the language of the finding.   *It* says that " the applica-

tion of the said Young was accepted." And again it speaks of an acceptance simply, when it says, "No notice of the acceptance of said application was given." An "acceptance" simply, is an acceptance unqualified; and an acceptance unqualified is an acceptance absolute; an acceptance pure and simple. After this finding of an absolute acceptance, and the signing, sealing, and transmission of a policy, the finding continues: "But the policy did not, in terms, agree with the memorandum as to date and time of payment;" and the differences are stated.

We have then the case of an application to the agent for a policy of a certain date and time of payment, and a contract to furnish such a policy, provided the application is accepted, and an acceptance absolute of the proposition. But instead of the transmission of a policy according to the application which has been accepted—that is to say, one with the proper dates, we have the transmission of one with other dates, dates not according to the proposition which has been accepted, that is to say, one with improper dates.

Now what, in law, is the effect of such a transaction? The same exactly as exists in the case of a statute enacting that such and such things shall be, with a proviso repugnant to the nature of the enactment. Such a proviso is simply insensible and void.

If A. offer to sell to B. a house for $10,000, the offer being perfectly explicit, with leave to B. to accept, or to decline, or reject within ten days, and B. within the ten days says, "I do not decline your offer, nor reject it; I accept it;" and with this absolute acceptance he send B. $9750, can any man say that the making of this is a "qualified acceptance," or a refusal to accept what is offered, and the making of a new proposition to treat on a different basis? Could not B. keep the $9750 and sue for the balance? The case before us is after the finding of an acceptance absolute, in essence, that case. And it is unimportant in what way you vary the figures, so long as you assume that there have been—what is here found as part of the case—that the offer made was "accepted."

This "pinch," the opposing counsel perceive and admit when they say :*

"The court did find that the application was accepted, and if such acceptance, accompanied as it was by the act of transmitting a policy different from that applied for, constituted in law an absolute instead of a qualified acceptance, then there was found a contract to insure."

And then they go on a technical ground, shown by themselves, it may be added, not to be true as respects a right to sue, that a contract to insure is not a contract of insurance.

Then, if our position as to the effect of sending an improper policy after the proposition of Young had been "accepted," is right, we have the case, confessed by opposing counsel to exist, of a contract to insure according to the application; and an admission also "that upon a contract to insure, the assured has a remedy by action at law, as well as by bill in equity."

The only difficulty set up on the other side is "that in such action the plaintiff must show the conditions of the policy contracted for, and that the loss claimed would be recoverable under them;" and that here two payments were due, which were conditions precedent to the policy taking effect, and that those two payments or the second one has not been made.

Let us concede this as a general proposition, to be true. But it is equally true that such prepayment may be waived.

And the question now is, has it in the case before us, been waived?

We assert that it has been.

It is elementary law that forfeitures are not favored, and that provisions for forfeiture must be strictly construed. The authorities also hold that these principles are applicable to forfeitures in insurance policies; that the provisions for forfeiture are inserted for the benefit of the companies and may be waived by them; and that courts will find a waiver upon slight evidence.†

* *Supra*, p. 92.
† See among many cases, Ripley v. Ætna Insurance Company, 29 Bar-

Now, let us see how the company itself applied these principles to the facts of this case.

The company asserts by its special pleas that the policy was issued and delivered to the defendant April 6th, 1867; that the first premium was not then paid; and that the second premium fell due July 6th, 1867, and was not paid.

The policy bears date April 5th, and the receipts prepared by the company correspond with this date. The company, therefore, regarded the second quarter's premium as due July 6th, and acted upon that idea, although the application was made, and the first memorandum, receipt, and contract given on June 5th. The promissory note given for the first quarter's premium being payable without grace, fell due August 4th. It will be seen that the condition of the policy imposing a forfeiture, required payment to be made " at the office of the company *in the city of New York*, or to agents *when they produce receipts signed by the president or secretary*, unless otherwise expressly agreed in writing." There is no evidence in this case of its having been otherwise agreed in writing. It does not appear that the policy was received at the San Francisco office before the 2d of August. At or about the 6th of July the policy must have been in the defendant's office in New York, which would give twenty-seven days to August 2d, to make the passage to San Francisco. The defendant knew at the time of dispatching the policy that the second instalment of premium had *not* been paid *at the office in New York*. It also knew that it *could not be paid to its agents in San Francisco* in accordance with the terms of the contract, so as to be obligatory upon defendant, for the reason that the *only receipt duly signed as specified in the policy* authorizing the payment to its agents was attached to the policy, and would not reach San Fran-

bour, 557; Goit *v.* National Protection Insurance Company, 25 Id. 189; Baker *v.* Union Life Insurance Company, 6 Robertson, 394; Boehen *v.* Williamsburg Insurance Company, 35 New York, 131; Bouton *v.* American Mutual Life Insurance Company, 25 Connecticut, 542; Pino *v.* Merchants', &c , Insurance Company, 19 Louisiana Annual, 214; Insurance Company *v.* Webster, 6 Wallace, 129.

cisco till the month of August, a month after it was due. The defendant did not expect payment at its office in New York city, or it would not have sent its receipts to its agent to enable him to receive payment. The defendant, then, by its officers in New York transmitted the policy and receipts with knowledge that payments had not and would not be made at the office in New York, and that it *could not be made elsewhere* in the mode required by the terms of the contract for a month after due. Yet the policy was sent with an intent that it should be delivered, and payment received by its agent in San Francisco, although it knew that there must necessarily be a forfeiture upon the strict letter of the contract. Also, after the receipt of the policy at San Francisco, on the 2d of August, nearly a month after the second instalment fell due, according to the terms of the policy, the defendant's agent, necessarily knowing that payment had not been made, stamped and countersigned the receipt, ready for delivery upon payment, thereby treating the agreement as still in force. Again, on the 8th of August, four days after the note given for the first quarter's premium fell due, and after default in payment, and, necessarily with knowledge of non-payment of both the note and second instalment, the agent of the defendant addressed to Young the note of the day just named, and set out, *supra*, p. 90.

This act, after the forfeiture, if any there was, had attached, recognizes the agreement as being still in force. The letter does not even demand payment, or refer to the fact of non-payment, or fix any time when the insured should call for the policy, or make payment. It simply informs him that his policy has arrived, and asks whether it should be sent to him at Vallejo, or whether he would call and get it, when in the city, implying that it would be at his option to have it sent to him at once, or wait his convenience till he should come to the city and be able to call for it. The defendant manifested no haste or anxiety upon the subject, for the policy was on hand from the 2d to the 8th of August at least before the notice to Young was even written, and it does not appear when it was sent. It does not appear that

this, or any other notice, reached him.   No other act of the company is shown inconsistent with this action, or tending to show an intention to insist upon a forfeiture till after the death of Young, when the policy was cancelled October 31st; payment of the loss having before been refused.

It could hardly have been expected that Young would call to make the second payment until informed whether the risk had been accepted, especially as there was ample time between June 5th, when the application was made, and the 5th of September, the time when the next payment would have fallen due, had the date of the policy agreed with the date of the application, and the preliminary memorandum of agreement given to him by defendant's agent in San Francisco.   It was, doubtless, supposed that notice of acceptance or rejection would be given before the note for the first quarter's premium would fall due.   But however this may be, the several acts of the defendant, and all its acts, and the acts of its officers in relation to the matter, which were performed subsequent to the accruing of the forfeiture, if any accrued, treat the agreement for insurance as still in force.   They, affirmatively, indicate an intention, not to insist upon a forfeiture, and had the accident and death not occurred, there can be no doubt, from the facts found, that even as late as the death of Young, the premium would have been received and the policy delivered.   We submit that upon the case as found there was a waiver of any forfeitures which had accrued, and that under the circumstances, after the death of the assured, it was too late, for the first time, to insist upon the forfeiture.

In conclusion, and reverting here to an earlier point of the argument, we may say that the counsel of the other side in arguing that the company in sending the policy which they did, only *declined* the proposition which Mr. Young made, and simply *proposed* a new one to him, are forced to assume that the company committed an impropriety towards Mr. Young and a departure from the usual, proper, decorous, and therefore the legal modes of doing business.   The

company was perfectly free to accept or to decline the proposition made to them.   If they meant to decline it and to propose a new proposition, their duty was to do this by a proper and customary sort of communication; and not to make out a new policy such as *their* interests but *not* Mr. Young's dictated, and then, however much against *his* interest, and only because it was in advancement of *their own*, force it down on him under penalty perhaps of his being harassed soon afterwards by a lawsuit for premiums, as upon an implied acceptance by him, unless he could show that, at his own cost and charges, he at once pitched their unasked for and undesirable policy back into their face.   Decency requires that any insurance company which thus seeks to force men into *its* purposes, against their own, should be held to have said, " Our policy sent is so favorable to us and so little favorable to you that we are willing to be bound, till we hear affirmatively from you that you do not accept; not expecting to hold you till we hear positively that you do." In such a case the company takes the risk of death occurring before an affirmative reply is received; and if death does occur, the company is concluded.

We are not here asserting that a " contract " in the strict legal sense of that word can be made, unless the party assured have heard of what is offered and have assented to it. But whether any " contract " can or cannot be made without his doing so is not the question.   The question is whether an insurance company which in the eager pursuit of its own interests, and in the disregard of other people's, so far departs from the customary, becoming, and proper modes of doing business, as to decline, in the way which it is here asserted that this company did decline, a proposition made to it, and to make, in the way, which it is here asserted that this company did make, a new proposition which it wished to have accepted,—whether a company so acting cannot be estopped from asserting, in its own interests and against the interest of its customers, that it did *not* make such a contract?   And whether when, by the death of the party, that is to say, when by the act of God, it has been caught in its

own supersubtle contrivances, and the administrator of the decedent comes into court with the company's own policy in his hand, " signed, sealed, and transmitted to their general agent," who had written to the party that it awaited his order—whether in such a case, a court may not hold " *Melior est conditio possidentis*," or, if the judicial dignity could ever properly translate the venerable maxims of the law into phrase not quite perhaps becoming the dignity of the ermine, say : " You have been rightly served."

We have, of course, in these remarks been going on the assumption of the other side, that the differences between the policy sent and the proposition made were regarded by the company as important. As we have already said, the policy sent was meant to be a substantial compliance with the proposition made by Young, and in truth was so, and certain to be accepted by him.

*Reply :*

1. The finding shows that Young's proposition was " accepted," not that it was " accepted absolutely." Admitting that by itself a finding that the proposition was " accepted " might mean that it was accepted absolutely, the finding of the acceptance is here not by itself. The same paragraph which states that the proposition was accepted and that a policy was sent, states also that the policy did not agree with the memorandum as to date and time of payment, and shows wherein the two things differed. This means plainly that the company accepted the life, but not the *exact* risk offered ; in other words, that it accepted the proposition qualifiedly.

2. All the acts relied on as showing a waiver relate—it may be remarked—to the policy which actually issued, and not to the contract alleged to result from the acceptance of the application.

But, passing by this.

To constitute a waiver there must be a valid agreement not to insist on performance of a condition precedent, or such acts as work an estoppel, from having influenced the

conduct of the party whose duty it was to perform the condition.

There was here no agreement; and such a thing as a waiver without the party bound to perform being influenced by the acts of waiver relied on, or being even cognizant of them, is without foundation in principle or precedent.*

Even if the acts relied on would constitute a waiver it would be merely of the article of time, and not of the payment of the premium during the continuance of the policy.

In no possible view of the case did the company consent to take the premium after the contract had been extinguished by death. Such a thing would simply abrogate any contract of insurance. Here there was no tender during the life of the party assured, nor, indeed, at any time.

4. No waiver is found by the finding, and any waiver is matter of fact.

5. It may be true that the *manner* in which the company declined the proposition made, and in which it offered a new proposition, was not the most formal that could be conceived. But we are inquiring not into forms, but into substance. The question is, "was the sending of the policy substantially the qualified acceptance of the proposition offered?" We submit that it was. The qualification proposed may have been the least possible. It was in fact but very slight. Still, Young could say, "My proposition has not been accepted. I decline the one offered; I care not whether it be better or worse; it is not *the same* as that made."

Mr. Justice SWAYNE delivered the opinion of the court.

The question presented for our determination is whether the findings warrant the judgment. The facts found lie within a narrow compass.

---

* Greenfield *v.* Massachusetts Life Insurance Co., 47 New York, 430; Trask *v.* State Fire and Marine Insurance Co., 29 Pennsylvania State, 198; Ripley *v.* Ætna Insurance Co., 30 New York, 136, 164; Baker *v.* Union Life Insurance Co., relied on by the opposing counsel, was reversed by the Court of Appeals, 43 New York, 283, 290.

Several objections, some of them technical, have been taken by the counsel for the plaintiff in error to the judgment rendered. We shall confine our remarks to one of them. It is fundamental, and goes to the right, justice, and law of the case. The receipt of the 5th of June was the initial step of the parties. It reserved the absolute right to the company to accept or reject the proposition which it contained. There was a necessary implication, that if it were accepted the response and acceptance were to be by a policy, in conformity with the terms specified in the receipt as far as they extended, and beyond that, in the usual form of such instruments as issued by the company. But it was clearly within the power of the company, under the condition expressed, wholly to reject the application, without giving any reason; or to accept the proposition with such modifications of the terms specified, and of the usual conditions of such policies, as it might see fit to prescribe. The entire subject was both affirmatively and negatively within its choice and discretion. The acceptance was a qualified one, and there was none other.

It was by a policy departing from the terms specified in the receipt in the particulars before mentioned but containing as to the conditions imposed otherwise, nothing beyond what was usual in such cases. At this stage of the business, the company was not bound according to the receipt, because it had not agreed to a part of the terms specified, and those terms were material and of the essence of the proposition. Clearly the company never did agree to those terms. What it would have done if the applicant had refused, as he might have done, to take the policy it is not material to consider. It is enough that the company did not so agree.

This court has no power to make such an agreement for it. The indispensable element of the consent of one of the parties is shown not to have existed. The contrary appears by the policy transmitted to the agent. The consent of the applicant appears, but that alone is unavailing. That fact, in any sound legal view of the case, is as if it were not. In

the analysis of the case the receipt, for the reasons stated, must be laid out of view.

This brings us to the examination of the controversy as respects the policy of insurance. Here the position of the parties is reversed. The applicant assented to the proposition contained in the receipt, but the company did not. The company assented to the policy, but the applicant never did. The mutual assent, the meeting of the minds of both parties, is wanting. Such assent is vital to the existence of a contract. Without it there is none, and there can be none. In this case it is not established by any direct proof, and there is none from which it can be inferred. This is not controverted. If it be alleged there was fault on the part of the agent, for which the company is responsible, in not communicating promptly and fully with the applicant upon the arrival of the policy, there are several answers to the imputation. Such fault, viewed in any light, cannot be taken as the legal equivalent of the assent of the applicant to the terms of the policy. But no such fault is shown. The applicant knew that the company was not bound, and would not be bound until it chose to become so, and that it had the right to do what it did. It was his duty to keep up the necessary communication with the agent by calling upon him when the answer from the office in New York might have been expected to arrive, and if he intended to be absent, by giving the agent his address during his absence, and taking from him a promise to communicate the result as soon as the reply was received.

It does not appear that he took any step whatever in this way. Neither he nor his personal representative, therefore, had any reason to complain. If he had received notice of the proposition made through the policy it would have been at his option to give or refuse his assent. He was certainly in nowise bound until such assent was given. Until then, there could be no contract on his part, and if there was none on his part, there could be none on the part of the company. The obligation in such cases is correlative. If there is none on one side there is none on the other. The requisite

assent must be the work of the parties themselves. The law cannot supply it for them. That is a function wholly beyond the sphere of judicial authority. As the applicant was never bound, the company was never bound. The policy was, therefore, no more a contract than the receipt. Both had the same fatal defect, the want of the assent of one of the parties.

Even where the parties supposed they had agreed and it turned out there was a misunderstanding as to a material point, the requisite mutual assent as to that point being wanting, it was held that neither was bound.*

The deceased paid nothing. The contest is an effort on that side to gather where he had not sown. The law involved is expressed by the phrase "it takes two to make a bargain."

In this view of the case, irrespective of the other considerations which have been urged upon our attention, we hold that the facts found do not warrant the conclusion reached.

JUDGMENT REVERSED, and the case REMANDED, with directions to enter a judgment

IN FAVOR OF THE PLAINTIFF IN ERROR.

---

* Baldwin & Forbes *v.* Mildeberger, 2 Hall, 176, a case at law; Coles *v.* Browne, 10 Paige, 526, a case in equity; see also Calverley *v.* Williams, 1 Vesey, Jr., 210, and Crane *v.* Partland, 9 Michigan, 493