**William F. STANSBURY, Appellant,**

v.

**LEGAL SECURITY LIFE INSURANCE COMPANY, Appellee.**

No. 11449.

Court of Civil Appeals of Texas.

Austin.

Dec. 21, 1966.

Rehearing Denied Jan. 11, 1967.

Mullinax, Wells, Mauzy, Levy & Richards, Otto B. Mullinax, Dallas, for appellant.

Douglas E. Bergman, by John W. Hicks, Jr., Dallas, for appellee.

HUGHES, Justice.

This suit was by William F. Stansbury, appellant, against Legal Security Life Insurance Company to recover benefits alleged to be due under an agreement or binder receipt existing between the parties in connection with appellant's application for a monthly disability income accident and health policy from appellee.[1]

The trial court granted appellee's motion for summary judgment.

The facts, about which there is no dispute, are these:

On June 14, 1964, appellee, through its agent, Harold Wynn, solicited from appellant an application for insurance entitling appellant to $400.00 per month if incapacitated from illness or injury during the term of the policy to be issued and subject to its provisions.

This application, duly executed by both parties, contained this agreement:

"AGREEMENT

I expressly agree on behalf of myself and any person who shall have or claim any interest in any policy issued on this application consisting of Parts 1 and 11 as follows: 1. All statements and answers contained herein (Parts 1 and 11 inclusive) are full, complete and true to the best of my knowledge and belief and are correctly recorded. This application, including Part 11 hereof, which Part 11 I agree to complete promptly as the Company may require, and any policy or policies issued in consequence thereof shall constitute the entire contract of insurance and the Company shall not be

---

1. The policy is styled, "Legal Security Income Policy."

bound in any way by any statement, promises or information made or given by or to any agent or other person at any time unless the same be reduced to writing and submitted to the Company at its Home Office and made a part of such contract. Only the President, a vice President, a Secretary or an Assistant Secretary may make, modify or discharge contracts or waive any of the Company's rights or requirements, and then only in writing. 2. The insurance hereby applied for shall not be considered in force until a policy shall have issued by the Company and said Policy manually received and accepted by me and the full first premium paid thereon, all during my good health; except that if the full first premium thereon is paid in advance to an authorized agent of the Company while I am in good health and the receipt detached from and bearing the same number as this application delivered, and the total amount of insurance applied for and now in force in the Company on my life does not exceed $10,000.00, and provided I am on this date a risk acceptable to the Company under its rules, limits and standards, on the plan, for the amount, and at the rate of premium declared paid, then the insurance in accordance with the provisions of the policy applied for shall commence on the date hereof. 3. The Company shall have sixty days from the date hereof within which to consider and act upon this application and if within such period a policy has not been received by me or if I have not received notice of approval or rejection, then this application shall be deemed to have been declined by the Company. 4. The Company is authorized to amend this application by an appropriate notation in the space designated 'Home Office Additions or Corrections' in order to correct apparent errors or omissions and in order to conform it with the form and content of the policy that may be issued. The acceptance of any policy issued on this application shall constitute an acceptance and ratification of any amendments made as contemplated above and of the beneficiary designation in such policy.

I HEREBY DECLARE that I have paid to the soliciting agent $——— in cash, and that I hold receipt for the same made up without alteration on the receipt form detached from and bearing the same date and number as this application.

I hereby assent to the terms of such receipt.

Dated at DALLAS this 14 day of JUNE 1964

Witness: _____  X /s/ William F. Stansbury

      Agent                Signature of Applicant

/s/ Harold E. Wynn

General Agent"

Appellant paid appellee the $24.00 premium on the day this agreement was executed and the receipt therefor was detached and delivered to appellant by Wynn, appellee's agent who stated to appellant that he was insured from the minute that he paid over his money.

On June 16, 1964, appellant's application and accompanying agreement were received by appellee from its agent. Appellee's underwriter, Junell, decreased the amount of insurance applied for from $400.00 per month to $300.00 per month, and the premium from $24.00 per month to $19.50 per

month. The underwriter made these changes on appellant's application and on June 22, 1964, notified appellee's agent Wynn of the changes made, and Wynn, on or about the same date secured the consent of appellant to the changes in his application.[2]

Appellee actually issued and delivered in the afternoon or early evening of June 25, 1964, a policy to appellant in accordance with his application. This policy bore the effective date of noon June 25, 1964. Appellant was injured about 11 a. m. June 25, 1964.

Appellee takes the position that appellant applied for insurance intended to be effective as of June 14, 1964, for $400.00 per month disability income but that this application was rejected by the issuance of a policy calling for $300.00 per month disability payments at a reduced premium, effective at noon June 25, 1964, the legal effect of which is, as it states, "under the general rule of contract, such rejection of plaintiff's offer and the subsequent counter offer by defendant terminated the insurance coverage provided by the receipt." To support this view appellee cites Mutual L.

2. Appellee asserts that appellant was merely advised of the reduction in coverage, not of the reduction in the premium. We disagree. We quote the relevant testimony of appellant:

"Q Now, I hand you this Exhibit 1 again, this policy application. You applied for a—what, four hundred dollars a month disability?

A That's what he wrote it, yeah.

Q And the policy as issued was three hundred dollars a month disability?

A Right.

Q Is that right?

A Right.

Q So, the policy was not issued in the amount that you applied for?

A But yeah, he came back and told me before the policy was issued that the company wouldn't go for it on account of the work that I did.

Q When did he come back and tell you that?

A Less than a week after he wrote it.

\* \* \* \* \*

Q —this has four hundred dollars on it and has been marked through, is the reason I say that.

A Yeah, well, that's probably the same, because he came back and told me about it. He was supposed to give me nine dollars and something in change, you know what I mean, on it.

Q The premium was reduced. It looks like you applied for four hundred dollars a month at twenty-four dollars—

A Now, he's the one that, you know, was sittin' and talkin' about it.

Q —was the first premium and then the premium was reduced to—

A Three hundred.

Q Well, the amount of coverage was reduced—

A Yeah.

Q —from four hundred to three hundred and the first or initial premium was reduced from twenty-four dollars to nineteen dollars and fifty cents.

A Right.

Q So, you had six—five dollars credit, around that.

A I didn't get it.

Q You didn't get it?

A No.

Q Was it applied to the policy or—

A No, I don't know.

Q —do you know what happened to it?

A But I never did get my change.

Q You never did get your change back. When do you say he came back and talked to you?

A I believe it was—

Q If it had been on June the 14th, the policy application, I think you said it was about a week later.

A Something like that; I am not sure, but I believe it was just about a week. It may not have been.

\* \* \* \* \*

Q And what did he ask you at that time?

A He didn't ask me anything; he just told me, he said that the company had reduced the policy down, and I said, 'That's all right with me, Harold.' And I said, 'It doesn't make any difference.'

Q And he said the company had reduced the policy down—

A To three hundred.

Q —from four hundred to three hundred?

A Three hundred.

Q And you said it was all right?

A It didn't make any difference."

Ins. Co. of New York v. Young's Adm'r, 23 Wall. (U.S.) 85, 23 L.Ed. 152.

In that case a policy of insurance was issued not in accordance with the application but before its delivery and before the applicant knew of its issuance a loss occurred. The application provided that the insurance should be effective from its date "provided that said application shall be accepted by the said Company." The court held there was no contract, no meeting of the minds. The Company did not accept the application, which it had the unconditional right to refuse, nor did the applicant accept the policy issued.

We do not consider this case helpful. Here, it is undisputed that appellee did accept the application, as amended. This fact is evidenced by the changes made in application by appellee and appellant's assent thereto, and by the issuance and delivery of the policy to appellant in accordance with the amended application.

Of similar import is Mohrstadt v. Mutual Life Ins. Co., 115 F. 81 (8th C.C.A.Mo.). There the Company had the unconditional right to refuse the application for insurance. The Company issued a policy differing from the one applied for but before it was delivered and before applicant was aware of its issuance, he died. The Court held there was meeting of the minds since the applicant had not agreed to accept the policy issued and the Company had not agreed to issue the policy described in the application.

Kronjeager v. Travelers' Ins. Co., 124 W.Va. 730, 22 S.E.2d 689, cited by appellee, is also a case where the minds of the parties did not meet.

Appellee cites Boswell v. Gulf Life Ins. Co., 197 Ga. 269, 29 S.E.2d 71, as fully supporting its position here. In fact, it refers to this case as a "white horse" case. We do not agree. There the receipt issued by the Company contained this provision: "If the application is accepted and a policy issued, this sum will be applied toward payment of the premiums thereon. If the application is rejected the amount will be returned subject to the conditions of this receipt hereof. No obligation is incurred by said company unless and until a policy is issued and delivered while the life proposed is alive and in sound health. Except that if the life proposed is in sound health at the date hereof and the amount paid at the time the application is written is not less than five weekly premiums and this receipt bearing the date of the original application showing such payment is surrendered to the company, the company agrees, if the application is approved at the home office in Jacksonville, Florida, that, should death occur prior to the issue of the policy and within eight weeks from the date of the application, it will pay such amount as would have been due under the policy, if issued."

The applicant in Boswell died before delivery of the policy. We quote from the opinion, "The plaintiff introduced a receipt issued by the company's agent on July 31, 1942, for *one* weekly premium 'on account of the application for insurance in the Gulf Life Insurance Company'". (Italics added.)

It is obvious that the applicant in Boswell did not activate the provision for temporary insurance. He paid only one weekly premium when the payment of at least five were required in order to obtain temporary insurance. Otherwise, the application plainly provided that in order for the Company to be liable the policy must be issued and delivered while the person to be insured was alive and in sound health.

Appellee also cites as being on "all fours" with this case the case of New York Life Ins. Co. v. Levy's Adm'r, 122 Ky. 457, 92 S.W. 325, (Ky.Ct. of Appeals). Here, the application was for two policies, each for $5,000.00. The Company accepted the application for one policy and after its issuance but before it was delivered, the applicant died. The Court held that the counter offer by the Company of one $5,000.00

policy had not been accepted by applicant and there was no contract of insurance between the parties. A dissenting opinion in this case is, in our judgment, worthy of careful consideration.

Also cited by appellee as supporting its position is State ex rel. Equitable Life Assurance Soc. of United States v. Robertson, 191 S.W. 989, (Sup.Ct.Mo.). This was a case in which the Company issued to the applicant a receipt which provided that the insurance should be effective from its date provided the applicant on such date was, in the opinion of the Company, "an insurable risk under its rules and the application is otherwise acceptable on the plan and for the amount applied for * * *" The premium fixed in the application and paid was $111.25. The Company accepted the application but advanced the age of applicant for rate purposes and fixed the premium at $137.55. Applicant died before accepting this change in his application. The Court held there was no contract since the counter offer by the Company was not accepted.

Appellee states in its brief, "* * * we do not contest that the receipt did not provide temporary insurance, but what we do contend is that the coverage afforded by the receipt was terminated upon the rejection of plaintiff's (appellant's) application."

We need not determine whether appellant had temporary insurance prior to the amendment of his application as no loss had theretofore occurred.

It is our opinion that appellant had temporary insurance after the amendment of his application by appellee and the approval of such amendment by appellant according to the application, as amended, and to the terms and provisions of the agreement quoted above.

All of the authorities relied upon by appellee are cases in which the Courts held

that since the minds of the parties had not met on all terms essential to the formation of a contract, no contract resulted. This is elementary contract law.[3]

There was a meeting of the minds of the parties here; hence, there is a contract.

That the application could be amended was written into the agreement. While the agreement provided that acceptance of a policy pursuant to an amended application would constitute a ratification of the amendments there is no reason to hold that such method of ratification was exclusive, and appellee does not so contend.

The agreement and application, as amended, and all their relevant provisions must be given effect. This means that appellant must prove by a preponderance of the evidence that on June 14, 1964, he was in good health and a risk acceptable to appellee under its rules, limits and standards, on the plan, for the amount, and at the rate of premiums paid as agreed.

As evidence, but not conclusive evidence, of these facts is the issuance of the policy by appellee.

The judgment of the trial court is reversed and this cause is remanded.

ARCHER, Chief Justice (dissenting).

I dissent.

The court did not err in sustaining the motion for summary judgment. I do not find any evidence of a contract of insurance in effect between the parties at the time of plaintiff's injury, and that as a matter of law the trial court correctly held that there was no genuine issue of material fact existing between the parties.

The policy issued by the insurance company was on terms different from those offered by plaintiff in his application, and was a counter offer.

---

3. See Allis-Chalmers Mfg. Co. v. Curtis Electrical Co., 153 Tex. 118, 264 S.W.2d 700, where it was held that only "a sub-stantial meeting of the minds" was required to formulate a contract.

The policy was delivered to appellant on the afternoon or early evening of June 25, 1964, and bore an effective date of 12:00 o'clock noon, June 25, 1964, which effective date was one hour subsequent to the claimed injury.

In order for a contract to come into being between two parties, the acceptance of an offer must be identical with the offer, without variance.

6 R.C.L., p. 608, Section 31.

Republic Nat. Life Ins. Co. v. Hall, 149 Tex. 297, 232 S.W.2d 697 (1950).

In Southland Life Ins. Co. v. Vela, 147 Tex. 478, 217 S.W.2d 660 (1949), it was held:

"No public policy is violated by a contract between an insurance company and an insured whereby premiums are to be paid from the effective date of the policy rather than the date of its delivery, even though the effect thereof is to charge a premium for a period when the insured has no protection. * * *"

United Founders Life Ins. Co. v. Carey, 363 S.W.2d 236 (Tex.Sup.1962).

This Court, opinion by Associate Justice Phillips, dissenting opinion by Associate Justice Hughes, in Legal Security Life Ins. Co. v. Ward, 373 S.W.2d 693 (Tex. Civ.App. Austin 1963, no writ), stated this proposition as follows:

"When the defendant company attached the riders excluding the various illnesses mentioned above to the policies in question it was not issuing plaintiff the policies applied for. A qualified or conditional acceptance is a counter offer. Springfield Fire & Marine Ins. Co. v. Hubbs-Johnson Motor Co., Tex.Com. App., 42 S.W.2d 248."

## ON MOTION FOR REHEARING

HUGHES, Justice.

We quote the following from appellee's motion for rehearing: "Appellee does not contend that appellant was merely advised of the reduction in coverage, not in the reduction of the premiums by the Agent, Harold E. Wynn, at the time of the purported conversation on June 22, 1964, as stated at the beginning of the footnote on Page 3 of this Court's opinion."

We correct our opinion accordingly.

The motion is overruled.