## Kosmos Portland Cement Co. v. Meeks, et al.

(Decided October 7, 1910.)

### Appeal from Meade Circuit Court.

Personal Injuries—Boy Using Windlass—Dangerous Instrument—Damages—Question for Jury.—Where an inexperienced boy 12 years of age was placed at work by his employers at the edge of a steep hill, operating a windlass used in drawing water from a spring below to the hill above, in an action by the boy against his employers for an injury by the breaking of the wire used on the windlass, and which had frequently been known to break by his employers; Held, that the boy was only bound to exercise such care as might be expected of one of his age and discretion, and this was a question for the jury.

L. A. FAUREST and JOHN D. HARDIN for appellant.

O. DOHERTY & YONTZ and J. M. RICHARDSON for appellees.

OPINION OF THE COURT BY WM. ROGERS CLAY, COMMISSIONER—Affirming.

In this action, appellee, William Meeks, suing by his father, as guardian, recovered a judgment for damages for personal injuries against appellant, Kosmos Portland Cement Company, in the sum of $3,000.00. Appellant's motion for a new trial being overruled, it appeals.

Appellant owns a rock quarry near the Ohio River in Meade county, Kentucky. From this quarry it takes rock to be used in making cement at its plant in Jefferson county. The quarry is situated on top of the river hill. In operating the quarry appellant had a contrivance for drawing drinking water up the hill from the spring below. This contrivance consisted of a windlass and two wires. The windlass was placed on top of the hill. One of the wires extended from a point back of the windlass to the spring, and was fastened at each end. Upon this

wire ran a pulley with a hook upon which a bucket was
suspended. One end of the other wire was fastened to
the windlass and the other end to the pulley. The water
was drawn up by winding this latter wire on to the
windlass. There was a lever that worked upon an iron
rod which passed through one end of it. By lifting up
this lever it was made to bear against the drum of the
windlass and act as a brake. In drawing water a bucket
would be placed upon a hook attached to the pulley and
the weight of the bucket would turn the windlass, unwind
the wire and run down the other wire to the spring. Here
the bucket would be filled by a boy and then drawn up by
turning the windlass. The evidence shows that if a buck-
et went down rapidly the wire would continue to unfold
after the bucket reached the spring, and this would cause
the wire to fly off the drum. In this condition it would
kink. The evidence also shows that the wire would re-
peatedly break. According to the evidence for appellee,
the iron rod that extended through the drum of the wind-
lass and rested upon the supporting timbers was bent,
and this fact also caused the wire to jump off the drum
on to the rod as the water was drawn up. Upon the ac-
casion in question this is what happened. When the wire
jumped off the drum, William Meeks, who was only
twelve years of age and had been employed by appellant
to operate the drum, attempted to put the wire back on
the drum. He was holding the wire with one hand and
turning the crank backwards with the other. The wire
broke, wrapped around his body and pulled him over
the hill.

Appellee claims he was not instructed how to operate
the windlass, and that no warning was given him. The
evidence for appellant is to the effect that when appellee
was employed he stated to the officers of the company
that he was fourteen years of age, and that he had his
father's consent to work in the quarry. They fully in-
structed him how to operate the windlass. It was alto-
gether unnecessary for appellee either to go in front of
the windlass, or to pull at the wire for the purpose of
unwinding it. According to their directions, he could
have operated the windlass with perfect security, but he
adopted a more dangerous place and a more dangerous
method.

Appellee based his cause of action on the failure of
appellant to furnish him a reasonably safe place in which
to work and reasonably safe appliance. Appellant in-

sists on this appeal that, whatever danger attended the operation of the windlass was right before appellee's eyes; that he knew of the danger and assumed the risk. For this reason, it is contended that appellant was entitled to a peremptory instruction.

Here we have the case of a master employing a twelve year old child, placing him at work on the edge of a steep hill, and putting him in charge of a windlass, the wire upon which had been known frequently to break. Under such circumstances, we cannot say, as a matter of law, that a child of such tender age knew and appreciated the danger of the work in which he was engaged; indeed, we are rather inclined to the opposite opinion. While an adult might have appreciated the danger and guarded against it, we doubt very much if a child could have done so. Nor can we say, as a matter of law, that appellee was guilty of contributory negligence because he changed his position for the purpose of unwinding the wire, and might have unwound it in a less dangerous manner. Appellee was bound to exercise only such care as might reasonably be expected of one of his age, experience and discretion; and whether or not he did this was a question for the jury to determine. We, therefore, conclude that the court did not err in refusing the peremptory instruction asked by appellant.

We deem it unnecessary to set out the instructions given by the court. Suffice it to say that they presented every theory of appellant's defense, and were even more favorable than it was entitled to.

The court did not err in submitting to the jury the question whether or not the place was reasonably safe. The evidence shows that the place of work was on the side of a steep declivity, and when considered in connection with the character of the contrivance which appellee was called upon to operate, it was for the jury to say whether or not the place was reasonably safe for that purpose.

We have carefully considered the language of the court in urging the jury, after it had announced a disagreement, to return and find a verdict, and can find nothing in it worthy of serious complaint.

Without giving in detail the other reasons assigned for reversal, we may say that none of them are such as to authorize us to reverse the judgment of the trial court.

Perceiving no error in the record prejudicial to the

substantial rights of the appellant, the judgment is affirmed.