AMARILLO NAT. LIFE INS. CO. v.
BROWN. (No. 551.)

(Court of Civil Appeals of Texas. Amarillo.
March 7, 1914. On Motion for Rehearing,
April 25, 1914. On Second Motion for Rehearing, May 9, 1914.)

1. INSURANCE (§ 665*)—LIFE INSURANCE—ACTION—SUFFICIENCY OF EVIDENCE—PAYMENT OF PREMIUMS.

In an action on a life policy, defended on the ground that the first premium was not paid, so as to put the policy into effect, evidence *held* to sustain a finding that the company intended to extend credit for the premium to its general agent and to permit him to extend credit therefor to insured.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1555, 1707–1728; Dec. Dig. § 665.*]

2. INSURANCE (§ 291*) — LIFE INSURANCE — HEALTH OF INSURED—FORFEITURE OF POLICY.

If insured was given credit for the first premium before he became in bad health, so as to operate as a constructive delivery of the policy, his subsequent illness would not defeat a recovery on the policy.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 681–690, 694–696; Dec. Dig. § 291.*]

3. INSURANCE (§ 136*)—LIFE INSURANCE—DELIVERY.

The retention of the policy by the local agent receiving it for delivery, at insured's request, was some evidence on the question of delivery to insured.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 219–230; Dec. Dig. § 136.*]

4. INSURANCE (§ 109*) — LIFE INSURANCE — CUSTODY OF POLICY.

The local agent of a life insurance company could become the custodian of the policy for insured, notwithstanding his agency for the company.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 133; Dec. Dig. § 109.*]

5. INSURANCE (§ 93*)—LIFE INSURANCE—UNAUTHORIZED ACT OF AGENT.

Though insurance agents violate the instructions of the company in taking policies, the company is liable if the act is performed within the apparent scope of the agent's authority. ·

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 123; Dec. Dig. § 93.*]

6. INSURANCE (§ 141*)—LIFE INSURANCE—APPLICATION BY INSURED—ESTOPPEL TO DENY.

An application for a 15-year endowment policy was rejected, but the general office prepared and forwarded to the general agent an application, with a corresponding policy, identical with that rejected, except that the term of the policy was 10 years and the premiums were greater. After holding the policy for some time, the general agent directed the local agent, who had an office with him, to ask insured if he wanted the policy, and the local agent called insured on the telephone and stated that the reason they had not sent the policy to him by mail was because it was for 10 years, instead of 15 years, and would cost somewhat more, when insured said, "That is all right; keep it for me until I come down," and stated that he would make the additional premium all right, after which the agent placed the policy with his private papers at a bank. Nothing was said in the conversation about insured signing any other application. Insured never signed the application for the second policy, and never had the second policy in his possession, and died shortly thereafter. *Held*, that the company, as well as the local agent, was estopped from claiming in a suit on the policy that the 10-year policy was ineffectual, because no application was made therefor.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 75, 253–262; Dec. Dig. § 141.*]

7. INSURANCE (§ 87*)—LIFE INSURANCE—ACTS OF AGENT—RESPONSIBILITY OF COMPANY.

An insurance company is responsible for the acts and declarations of their local agents within the scope of their employment.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 116, 121; Dec. Dig. § 87.*]

8. INSURANCE (§ 602*) — LIFE INSURANCE — PAYMENT OF POLICY—PENALTIES FOR NONPAYMENT.

The statute providing for damages and attorneys' fees for refusal to pay an insurance policy within the time specified in the statute if liability thereon be established, is constitutional. .

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 1498; Dec. Dig. § 602.*]

9. APPEAL AND ERROR (§ 1068*)—HARMLESS ERROR—INSTRUCTIONS.

An instruction in an action on a life policy that the jury should find as "attorney's fees $——" was harmless to defendant, though irregular, in absence of a showing that the jury found improperly on the item of attorneys' fees.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4225–4228, 4230; Dec. Dig. § 1068.*]

10. APPEAL AND ERROR (§ 1051*)—HARMLESS ERROR—ADMISSION OF EVIDENCE.

Error in admitting evidence of a telephone conversation between a witness and decedent was harmless, where another witness testified for appellant that the former witness told him the same thing after decedent's death.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4161–4170; Dec. Dig. § 1051.*]

11. INSURANCE (§ 654½*)—LIFE INSURANCE—ACTIONS—ADMISSION OF EVIDENCE.

In an action on a life policy, claimed by the company not to have become effectual because of failure to pay the premium while insured was in good health, evidence that insured was a man of considerable wealth was material on the question whether the agent extended credit to him for the premium as claimed by plaintiff.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 1674, 1686; Dec. Dig. § 654½.*]

12. INSURANCE (§ 187*) — LIFE INSURANCE — PAYMENT OF PREMIUMS—CREDIT—NOTE.

Rev. St. 1911, art. 4741, prohibits the issuance of life policies, unless the contract provides that all premiums shall be payable in advance to the home office, or an agent, on delivery of the receipt signed by one or more of the officers designated in the policy, and provides that the policy and application shall constitute the entire contract. Article 4954 prohibits discrimination between persons insured of equal life expectation in the amount of premiums charged, and prohibits companies or their agents from making any agreement other than expressed in the policy, under the penalty of criminal prosecution and a forfeiture of authority to do business. *Held*, that the statutes did not make a policy void, where the company extended credit and received another's obligation as payment of the first premium due, instead of cash payment.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 399–401; Dec. Dig. § 187.*]

Appeal from District Court, Lubbock County; W. R. Spencer, Judge.

Action by Martha A. Brown against the Amarillo National Life Insurance Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Madden, Trulove & Kimbrough, of Amarillo, and Roscoe Wilson, of Lubbock, for appellant. Ed. J. Hamner and Geo. T. Wilson, both of Sweetwater, for appellee.

HENDRICKS, J. In accordance with appellant's brief, this suit is one by Martha Brown, the surviving wife of Willis B. Brown, against the Amarillo National Life Insurance Company, the appellant, to recover $5,000 principal, with interest and 12 per cent. damages, and $1,000 attorney's fees, claimed to be due upon a certain policy alleged to have been issued and delivered to her husband, Willis B. Brown, insuring his life in said sum of $5,000. Prior to the time the policy in suit was written, Brown executed an application for a 15-year endowment policy, which required the payment of 15 annual premiums of $427.05, in which application, as well as the substituted application, hereinafter explained, the following provisions are found:

"I hereby agree as follows: (1) That if this application is accepted the policy issued hereunder shall not take effect until the first premium shall have been paid to and accepted by the company or its authorized agent, and said policy delivered to and accepted by me, and all during my continuance and while I am in good health. * * * (6) That only the officers of the company at the home office can accept or reject this or any application, and that no knowledge of any person and no statement made or given by or to any person shall bind the company or in any manner affect its rights, unless such knowledge and statement are set forth in writing in this application. * * *

"What Constitutes a Contract. This policy and the application therefor, taken together, constitute the entire contract, and the same cannot be waived or altered, or its conditions waived or extended in any respect, except by the written agreement of the company signed by the president or secretary, whose authority will not be delegated."

The general officers of the insurance company rejected the application for a 15-year endowment policy and canceled the same, reissuing another application prepared by said company with the questions and answers, including the date, identical with the first application, except the difference in the amount of the premium and the term of the policy applied for. The company at Amarillo prepared the policy sued upon, which was also the same as the policy applied for, except an increased premium of about $200, and was a 10-year endowment, instead of a 15-year, and mailed said substituted documents to its agents, Wellborn Bros., at Snyder, Tex., on April 26, 1911, instructing them as hereinafter indicated in this opinion.

The appellant insists in this cause that the policy issued did not take effect because the first premium had not been paid to and accepted by the company or its authorized agent in accordance with the provision first quoted. The evidence in this case discloses that the policy was dated back to the time of the original application, and that the company was relying upon the original answers in said application, when it prepared the substituted application, which was never signed by Brown.

Mr. G. J. Brothers, the secretary of the insurance company, testified that on account of some additional information with reference to the insured the application committee were not willing to issue and deliver the policy on the 15-year endowment plan, but were willing to issue the policy which was executed by the company on the 10-year endowment plan, and hence canceled the original application. The confidential report, demanded by the insurance company and accompanying the first application forwarded by the agent, in this case, reads: "If no settlement has been made for the first premium, state how and when it is expected to be made." The answer appended to this question was, "October 1, 1911," and which confidential report was in the papers of the insurance company in this cause, and when the substituted policy, with the substituted application was forwarded by the insurance company to the agents, there were no instructions to make the first payment upon the new policy in cash or in any different manner from that called for in the confidential report. Mr. Brothers testified: "We sent that policy, No. 982, out of our office according to the rules and customs of our company, and then charged Mr. Wellborn up with the amount of the premium on the policy due the company, subject to a credit if that policy was returned. * * * It was the practice of the company to leave the matter of delivery with the agent and simply hold him responsible according to the terms of the policy and the written contract (meaning an indemnity contract executed by the agent and sureties, payable to the company), without specifying the time when he should make delivery of the policy and that was the practice observed in this case."

It is true that he said that the matter of charging the agent with the amount of the premium on the policy "was just a matter of keeping a record of the transaction," but we are inclined to think the testimony clearly indicates a credit extended to the agent for the amount of the premium. Wellborn said: " * * * When I sent the Brown application, I notified the company I had taken his note because that was my practice." This notification was probably the question and answer in the confidential re-

port. He further said: "In my dealings with the company there was not any specified rule in respect to the first premium received by me on policies as to how often I should have a settlement with them. I would make my collections along when they were due, and deposit them, and send them the deposit slip, and sometimes it would be two months, and sometimes three months, and sometimes longer." This testimony was not rebutted; but, as far as the testimony of Brothers traveled in the same direction, Wellborn's testimony in this respect as to the practice of the company was corroborated and confirmed.

Nelson, the subordinate agent, who was connected with this transaction, had his office with Mr. Wellborn, and each had access to the correspondence of the other; Mr. Wellborn being what is termed in this record as a "general agent" for the business of the insurance company. These parties kept their books separately, but worked with each other with reference to the solicitation of insurance. Mr. Wellborn said, in regard to the credit extended to Brown: "It was my business that I let him have the policy on credit, because I was responsible to the company. * * * In fact, if he had asked me for credit for a year's time, I would have given it, and paid it myself." The record shows that Brown was a man of considerable wealth, having ample means and resources.

Bearing in mind the foregoing testimony, taken in connection with subsequent testimony referred to in this opinion, we cite the case of Elkins v. Susquehanna Mutual Fire Ins. Co., by the Supreme Court of Pennsylvania, 113 Pa. 386, 6 Atl. 224, the syllabus of which fairly reflects the holding of the court: "It is competent for a fire insurance company to waive a condition in its policy that the company should not be liable * * * until the premium is actually paid; and where the course of business between the company and one of its agents tends to show that the company was accustomed to substitute the personal liability of the agent for premiums received in the place of the security which the suspension clause in the policy afforded, * * * the case should be submitted to the jury." Also see the case of Kilborn v. Prudential Insurance Co., 99 Minn. 176, 108 N. W. 861.

The Supreme Court of the United States, in the case of Knickerbocker Insurance Company v. Norton, 96 U. S. 234, 24 L. Ed. 691, in speaking of this matter said: "That it (meaning the insurance company) did authorize its agents to takes notes, instead of money, for premiums, is perfectly evident, from its constant practice of receiving such notes when taken by them. That it authorized them to grant indulgence on these notes, if the evidence is to be believed, is also apparent from like practice. It acquiesced in and ratified their acts in this behalf. For a long period it allowed them to give an indulgence of 90 days; after that of 60 days; then 30 days. It is vain to contend that it gave them no authority to do this, when it constantly allowed them to exercise such authority, and always ratified their acts, notwithstanding the language of the written instrument."

The Iowa Supreme Court, in the case of Kimbro v. New York Life Insurance Co., 108 N. W. 1025, 12 L. R. A. (N. S.) 427, referred to in this opinion upon another point, in commenting upon this particular matter, said: " * * * It was a common practice, known to and approved by the company, for agents to take such notes payable to themselves, and charge themselves therewith in their agency accounts, the company holding the agents responsible as for a cash collection. * * * The giving of the note instead of cash in advance by the applicant will not invalidate the insurance, if the contract be otherwise complete"—citing and using the same cases as authority on this same point as used by us above.

In the case of Life Ins. Co. of Virginia v. Hairston, 108 Va. 848, 62 S. E. 1064, 128 Am. St. Rep. 989, it is said: "In this case, the special agent, Ayres, had given the bond of a guaranty company to make good all that might be due by him to the insurance company; and it appears from the evidence of the general agent that it was a practice, known to and approved by the company, for agents to take such notes, payable to themselves, and charge themselves therewith in their agency account, the company holding the agent responsible as for a cash collection." And practically to the same effect is the case of New York Life Ins. Co. v. Pike, 51 Colo. 238, 117 Pac. 902, by the Supreme Court of Colorado.

[1, 2] While the evidence does tend to show that Wellborn remitted to the insurance company when he made his collections, and in the particular instance as to the Brown policy, he credited the collection in the bank to the insurance company; but it is also reasonably and fairly persuasive that the company intended to extend the credit to Wellborn, and to permit him to extend credit to the insured, and the evidence is without contradiction that when the telephone communications between Nelson and Brown occurred, hereinafter disclosed, the latter was in good health. And as the Supreme Court of South Carolina expressed it, in the case of Dargan v. Equitable Life Assur. Soc., 71 S. C. 360, 51 S. E. 126: "If there was a constructive delivery upon credit for the premium at any moment before the insured became in bad health, the subsequent illness of the insured could not change the status, or defeat a recovery upon the policy; certainly if the insured died within the period of the probable credit."

[3] This case is also authority for the proposition that, if the local agent receiving it for delivery retained the custody of

the policy by the request of the insured, that was some evidence to go to the jury on the question of delivery. "If, therefore, the agent of the defendant, after notifying the insured that he had the policy for delivery, received instructions from the insured to hold the policy for the insured, and so held the policy, there was evidence of a constructive delivery of the policy to the insured while in good health"—meaning, of course, as applicable to the facts in that case, which upon the distinct point is rather applicable to the facts here. We are not citing the above cases as wholly applicable on account of a total similitude of the facts, but think the facts are sufficiently similar, superinducing the principles enunciated, to make them pertinent; and as said by the Supreme Court of Virginia, in the Hairston Case, supra, 108 Va. 852, 62 S. E. 1065, 1066, 128 Am. St. Rep. 989: "Our view is * * * that the policy was in effect in this case (unless defeated upon other grounds), because the company, through its general agent, knew of all that had taken place between the special agent and the insured, and because, under the circumstances of the case, and in accordance with the practice of the company, there had been, as between the applicant and the company, a payment of the premium before the policy was delivered."

It is true that Wellborn indicates that the Brown application was the beginning of his individual connection with the company referable to his general agency; but the testimony is quite susceptible of the construction that in some capacity, or associated with another, he had had dealings with the company and understood its custom and manner of conducting its business in this respect, and his particular individual agency lasted for several months subsequent to the time of his appointment. Though the subordinate agent, Nelson, sustained in a sense a direct relationship to the company as to its business by virtue of his contract with the company, however, it cannot be said, considering the record here, that his acts connected with the transaction effectuating this policy are referable to the special agency. He was also acting for Wellborn, who was acting for the company; and if Nelson's acts in connection with the transaction, if they had been performed by Wellborn, would have bound the company, they are not the less binding on the company because manifested by Nelson where he touched the matter.

[4] Neither are we able to agree with appellant that Nelson, being an agent of the company, was unable to become the custodian of the insured as to the particular policy. Phoenix Assurance Co. of London v. McAuthor, 116 Ala. 659, 22 South. 903, 67 Am. St. Rep. 154; Young v. St. Paul Fire & Marine Ins. Co., 68 S. C. 387, 47 S. E. 682.

Upon the matter of waiver of the payment of the premium, appellant insists that the following statute (Rev. St. 1911, art. 4968, c. 15, tit. 71) is applicable: "Any person who shall solicit an application for insurance upon the life of another shall in any controversy between the assured and his beneficiary and the company * * * be regarded as the agent of the company, and not the agent of the insured, but such agent shall not have the power to waive, change or alter any of the terms or conditions of the application or policy." As applicable to the immediate question under discussion as to a waiver by the soliciting agent of the payment of the premium in cash, we hold, being bound by the verdict of the jury upon the evidence, that the company itself had waived the payment, and that the agent had the authority to extend the credit as he did.

However, the question remains, and, as we view the cause, it is the important issue in the case: Did the insurance company and the insured make a contract when the company's agent had the telephone conversation hereafter mentioned, and the company refused to issue the 15-year endowment policy upon the original application of the insured, and substituted a 10-year endowment with an increased premium upon a new application prepared by the company, in every respect a duplicate of the original application, except a difference in the term and premium, with instructions to Wellborn in accordance with the following letter, dated April 26, 1911: "Inclosed I hand you policy No. 982, on the life of Willis B. Brown. This you will note is a ten-year endowment G. C. policy, instead of a fifteen-year endowment G. C. policy, as applied for. The application committee made this change, because of the reports received in regard to applicant's habits. We trust that you will have no difficulty in delivering this policy, and inclose herewith new application to be signed in the event you deliver this policy."

Condensed from appellant's brief, which is a fair presentation of the record, the evidence discloses that Brown during this time resided about 40 miles from Snyder. When Wellborn took the first or original application for a 15-pay policy on March 21, 1911, he accepted from Brown a note made payable to himself for $427.05, due October 1, 1911, understood between them to be the first premium payment on the policy as applied for. Before the insurance company's letter quoted above reached Snyder, inclosing the new policy and the application, Wellborn had gone to Dallas on account of sickness, and the letter mentioned was opened by the subordinate agent, W. W. Nelson, who sometimes worked with Wellborn in the insurance business, having a desk in the latter's office in Snyder, and having charge of the office when Wellborn was away. Nelson "pigeonholed" the new application and policy until Mr. Wellborn returned from Dallas, the former then reporting to the latter that the policy

was there, and thereupon Wellborn instructed Nelson "to phone Mr. Boly Brown and state to him the difference in the price and find out what he wanted to do." "Nelson reported to Wellborn the next day that he had done as requested, and that Mr. Brown said: 'It was all right. He would be down in a couple of weeks and get it.' Nelson says that on or about the 2d or 3d day of June, 1911, at the instance of Wellborn, he had a conversation over the phone with Brown, as follows: 'I told Mr. Brown that we had his policy, and that it had been there quite a good while, and that we could not keep it any longer; that we either had to return it or deliver it, and if he didn't want it we would have to send it back; that he told me to keep it for him until he came down. I told Mr. Brown that the reason we had not sent the policy by mail was because it was not the kind he applied for; that it was a ten-year instead of a fifteen-year, and would cost about $200 more a year, and he said, "That is all right; keep it for me until I come down." In regard to paying. the additional premium he said, "I will make that all right with you when I come down." In that conversation I didn't say anything to Mr. Brown about signing. any other or additional application. In that conversation he said he would be down in about two weeks. After the conversation I took the policy out of the office and put it with my private 'papers.' "

The evidence further discloses that he placed the same in a private receptacle of his at a certain bank. The conversation of Nelson with Brown over the telephone was upon the previous Saturday before the death of Brown on the following Wednesday. Brown never signed the application and never had the manual possession of the policy. The note to Wellborn including the additional premium called for in the new policy, was paid to Wellborn after Brown's death.

[5] On consideration of the decisions, and in tracing the progress of the law upon the subject, there is indicated a development of a doctrine in the nature of equitable estoppel where, though agents violate the instructions of their principals, the latter are liable if the act is performed within the apparent scope of the authority, which is tantamount to actual authority. A simplification of the status of this case, if we view it correctly, may to some extent tend to its solution. If the proper officer at the home office, having the authority to deliver the policy, had telephoned Brown the same communication Wellborn did, or that Nelson did for Wellborn, and Brown had answered in the same manner he replied to Nelson, and the particular officer delivered it to some bank, assuming that he was so instructed by Brown, with the understanding that Brown would arrange for the premium when he came to Amarillo, and the latter suffered an accidental death the following day, would the company have

been liable? If the officer mentioned had neglected to inform Brown, through inadvertence or otherwise, that the president of the company had instructed him not to deliver the policy until the substituted application was signed by Brown, would the company have the right to say to the beneficiary, "There is no contract; the minds of the parties never met." To extend the illustration: If Brown had stepped to the counter of the particular officer, and upon inquiry it was explained to him that the policy was the same as the one applied for, except that it was a 10-year endowment instead of a 15-year, and the annual premium was $600 instead of $400, and Brown had said, "All right," and had actually paid the $600 in cash, and in descending the steps had broken his neck; would the company have the right to say to the beneficiary: "The president prepared a new application, with instructions to procure its execution upon delivery of the policy, and the contract was never completed. Brown's first application was rejected, and the delivering officer had no power to deliver it, except upon private instructions of the president of the company requiring the execution of a new application, and Brown was notified by the policy that the application and the policy constituted the entire contract, and as Brown never signed the substituted application, and as he was bound to know that the new policy delivered to him was a mere counter proposition, the minds of the parties never met upon what the company intended to offer and the policy was never, in law, delivered."·

In a case where the company's agent had prepared an application for the insured, signed by the latter, and the question was asked as to other insurance, and the written answer was, "No other," and the insured had $10,000 of co-operative insurance, which the agent, although informed, did not regard as insurance, the Supreme Court of the United States said: "His act (meaning the agent's) in writing the answer, which is alleged to be untrue, was under the circumstances the act of the company. If he had applied in person to the home office for insurance, stating in response to the question as to other insurance the same facts communicated by him to Boak (the soliciting agent), and the company, by its principal officer, having authority in the premises, had then written the answer, 'None,' it could not be doubted that the company would be estopped to say that insurance in co-operative societies was insurance of the kind to which the question referred and about which it desired information before consummating the contract. The same result must follow where negotiations for insurance are had under like circumstances between the insured" and the agent of the company. Continental Ins. Co. v. Chamberlain, 132 U. S. 311, 10 Sup. Ct. 87, 33 L. Ed. 341.

We believe that a critical analysis of the cause of Kimbro v. New York Life Ins. Co.,

108 N. W. 1025, 12 L. R. A. (N. S.) 427, by the Supreme Court of Iowa, sustains this view when the status of the facts of that case is correctly weighed and balanced. The applicant, Kimbro, when he signed the application for insurance, executed his note for the first premium to the local agent of the insurance company. The company, on receipt of the application, concluded not to issue the policy applied for, but forwarded to the agent a different policy to be submitted to Kimbro. The soliciting agent made no mention of the change in the policy, but simply communicated to Kimbro through the mail of the receipt of the policy, stating in substance that he had been apprehensive that Kimbro might be rejected, but was pleased to say that the policy had arrived, and that he would call upon Kimbro the next pay day and deliver the same to him. The company, in mailing this policy to the soliciting agent, called the latter's attention to the change in the policy, directing him to submit the same to Kimbro, with proper explanations, for acceptance, if found satisfactory, which, as stated, the agent failed to do. The agent and Kimbro had an agreement for credit with reference to the payment of the premium, and the latter was entirely innocent of the company's declination of the former application, and was immediately taken sick and died before the maturity of the credit. The court in effect held that from the forwarding of the application, and the communication by the agent to Kimbro that the policy had been received, the applicant had the right to assume that his application was accepted as proposed and that the contract was closed; the agent having the apparent authority to notify the insured his proposition was accepted and to deliver the policy. The Supreme Court of Iowa said: "That agent was its [the company's] representative, not only to receive and forward the application, but was also its representative expressly authorized to complete the negotiations and deliver the policy which the appellant prepared and returned for the applicant's acceptance. He was the only medium through whom the business between the contracting parties was carried on. Within the scope of that employment, his hand was the appellant's hand, his voice was its voice, and his promises and assurances were the promises and assurances of his principal, notwithstanding any undisclosed instructions or limitations existing in his contract of employment."

It was alleged in that case by the company that the instruction with reference to the new policy and the rejection of the application was never carried out by the agent, and that Kimbro never consented to receive or accept the substituted policy, and no contract of insurance was ever consummated or agreed upon. The beneficiary replied that the company was estopped by the acts of its agent to deny the existence of the contract or the company's liability thereon. The Supreme Court of Iowa, in the Kimbro Case, supra, in adopting the language of the Supreme Court of Kansas in the case of Preferred Accident Ins. Co. v. Stone, 61 Kan. 48, 58 Pac. 986, further said: "It is argued that these statements were by an agent whose powers were limited and special, and that the company was not bound by them. * * * It was the custom of the company to deliver policies on accepted applications through its local agents, and also through them to return premiums paid on applications which it rejected. This qualified the agent to impart information in respect to those things which were to be done by him. The giving of information in respect to a thing which, when to be done, the company would intrust to him to do, came within the scope of his authority."

Of course, as illustrated by the cases cited by appellant, Insurance Company v. Young, 23 Wall. 85, 23 L. Ed. 152, and Mohrstadt v. Mutual Life Ins. Co., 115 Fed. 82, 52 C. C. A. 676, where the applications, or proposals for insurance, have been rejected by the insurer, and the latter makes counter propositions in the nature of different policies, which were never accepted in reality by the insured, the original applications are extinct. Necessarily the applicant for insurance could not recover upon the old application, as it was never accepted by the company; and the recovery upon the new policies, or counter propositions, is equally fatal, as the same were never accepted by the insured. The element entering into the case here is however entirely lacking in the cases cited.

[6] We think the pleadings of appellee, the charge of the court, and the evidence sustain the case in accordance with the doctrine stated; if we are correct in our conception of this doctrine as applicable to the cause, the original application being in every respect conformable to the policy stated, except as to the difference mentioned, and the conduct of the parties preventing assertion by the insurance company that it had not made the contract, the provision of the contract, that the application and policy constituted the entire contract, is fulfilled; the conduct of the company is an implied assertion that the new policy is based upon the old application, with the change indicated in the new policy, and Brown, if he had read the new policy, would necessarily conclude that, as a natural inference; the company had led him to believe it. And if the company would be estopped from saying that the policy had no application as a part of the contract, Brown would be equally bound upon the old application, and equally estopped.

[7] The Supreme Court of the United States, in the case of Union Ins. Co. v. Wilkinson, 13 Wall. 235, 20 L. Ed. 623, said: "The powers of the agent are prima facie coextensive with the business intrusted to

his care, and will not be narrowed by limitations not communicated to the person with whom he deals. * * * An insurance company, establishing a local agency, must be held responsible to the parties with whom they transact business for the acts and declarations of the agent, within the scope of his employment, as if they proceeded from the principal"—the clearest enunciation of the doctrine of implied power we have been able to find. See Morrison v. Ins. Co., 69 Tex. 353, 6 S. W. 608, 609, 5 Am. St. Rep. 63; Ins. Co. v. Lee, 73 Tex. 641, 11 S. W. 1024; Ins. Co. v. Griffin, 59 Tex. 513, 514.

We do not think the statutes quoted would apply to a case as evidenced by this record, and the main charge of the court, with the requested charges submitted by the court, we think, upon the whole, presented the real issues in the case, at least to the extent of not being subject to the complaints made.

[8] The constitutionality of the statute, providing for damages and attorney's fees, in the event of liability and the refusal to pay the policy within the time specified in the statute, is concluded by the Supreme Court of the United States in the case of Fidelity Mutual Life Ins. Co. v. Mettler, 185 U. S. 308, 22 Sup. Ct. 662, 46 L. Ed. 929. The only evidence in the case in regard to the reasonableness of the attorney's fees placed the amount at $1,000, with the predicate laid as to the amount of work and the value of the same in cases of like character and based upon the experience of the witness.

[9] We do not believe that the court arbitrarily fixed the amount in the charge, but charged the jury to find as attorney's fees $———; of course, an irregular presentation of the matter. The jury, however, had discretion as to amount, as it was not fixed by the court; but we are inclined to think the jury found properly upon the only proof offered. No special charge was requested on this point, and we are not advised as to how any injury could have resulted, or an improper verdict was produced by the irregularity.

[10] The complaint as to the admission of testimony in one instance is cured by one of appellant's requested charges; in another, the modification to the bill of exceptions appended by the court clearly makes the testimony admissible; in another instance, the cases of Insurance Co. v. Eastman, 95 Tex. 37, 64 S. W. 863, and Nat. State Bank v. Ricketts (Civ. App.) 152 S. W. 648, 649, exhibit the admissibility of the testimony; and as to a portion of Nelson's testimony, with reference to what occurred between Nelson and Brown in the telephone conversation, Mr. Smith, at one time the general manager of the company, and a witness in its behalf, testified that Nelson told him the same thing after the death of Brown, which was in conformity with Nelson's testimony upon the trial.

We have attempted to carefully consider the assignments of the appellant in this cause, and conclude upon the whole that the judgment of the trial court should be in all things affirmed, overruling all assignments not specifically mentioned.

Affirmed.

HUFF, C. J., not sitting.

### On Motion for Rehearing.

HENDRICKS, J. In this cause the record is susceptible of the construction that Wellborn Bros. were the general agents of the insurance company. The contract between them in writing was signed by them as general agents, and provided that the appellant had appointed "said second party as its general agents"; and considering the territory embraced in said contract, with the power delegated to them to appoint subordinate agents, and the absence of any evidence contradictory of such an inference, justifies the conclusion that their relation to the company was of such capacity.

The record indicates that a confidential statement was made on a blank form furnished by the company, and we clearly think by this form, with the answers thereto, in connection with the testimony of Mr. Brothers, the secretary of the company, and Mr. Wellborn, the general agent, and Nelson, the subordinate agent, that it was contemplated by the company that its agents might take notes for premiums or extend credit to applicants for policies for the purpose of obtaining insurance. It did indicate that notes were taken at agents' risk, but the company also desired a description of the same, and indicated that no cash might be paid at all, by the question to the agent, "Have you received any cash?" And the further recitation by the company in this confidential statement indicates that a settlement for the first premium may be made in a different manner than that of a cash payment, as follows: "If no settlement has been made for first premium, state how and when it is expected to be made." In this instance, the statement of the agent was, as to the settlement of the first premium for the insurance first applied for by the applicant, Brown, that the settlement for the first premium would be made the 1st day of October, 1911; and Mr. Brothers, the secretary of the appellant testified: "We issued this policy in suit on the original confidential report," etc.

The appellant seems to be seriously insistent in this matter that we erred in concluding that the evidence supported the jury's verdict in regard to the extension of credit to Wellborn by the company and the power of the latter to extend credit to Brown for the premium. Unless for some legal reason the power could not be exercised by the company, upon the theory in support of the jury's verdict, the evidence was amply sufficient. As expressed by the Supreme Court of Massachusetts, however, in a fire insurance cause, upon partly a similar state

of facts (White v. Conn. Ins. Co., 120 Mass. 332): "It is a fair inference, from all this, that the duly authorized agent of the company [in this case a general agent dealing with a subordinate representative] had accepted the individual credit of Hunt as a payment of the required premium. It is not a question of waiver, by parol agreement, of an express stipulation in a written contract, within the cases cited by the defendant. It is rather a compliance with the condition required to give validity to the policy, within a large class of cases in which it is held sufficient. Tayloe v. Merchants' Ins. Co., 9 How. 390–402 [13 L. Ed. 187]; Miller v. Life Ins. Co., 12 Wall. 285–303 [20 L. Ed. 398]; Sheldon v. Atlantic Ins. Co., 26 N. Y. 460 [84 Am. Dec. 213]; Sheldon v. Connecticut Life Ins. Co., 25 Conn. 207 [65 Am. Dec. 565]; Bouton v. American Life Ins. Co., 25 Conn. 542." The following additional authorities, in certain portions of the different opinions, are distinctly upon the point: Fidelity & Casualty Co. of N. Y. v. Willey (C. C. A. 3d Circ.) 80 Fed. 499, 25 C. C. A. 593; Miss. Valley Life Ins. Co. v. Neyland, 72 Ky. (9 Bush) 435–437; Wytheville Insurance & Banking Co. v. Teiger, 90 Va. 277, 18 S. E. 196; Lebanon Mutual Ins. Co. v. Hoover, 113 Pa. 591, 8 Atl. 164, 57 Am. Rep. 511.

Appellant asserts that the evidence totally fails to justify our statement to the effect that Nelson, the subordinate agent, reported to Wellborn the next day that he had notified Mr. Brown over the telephone, in regard to the policy and the disposition to be made of the same, and reported to Mr. Wellborn that "Mr. Brown said it was all right; he would be down in a couple of weeks and get it." We accepted this statement from page 17 of the appellant's brief, verified by us from the statement of facts, and there is no contradictory statement in the brief of the inference and the fact stated. We are now referred to the record that this is not true on account of certain testimony, but in reading all the testimony closely we are clearly of opinion that it was a matter entirely for the jury.

[11] Appellant says that the finding that Brown "was a man of considerable wealth, having ample means and resources," is wholly immaterial. It is clearly material on the question of extension of credit.

Appellant again insists that the following statement (as quoted by it) is also error: "The note to Wellborn included the additional premium called for in the new policy, was paid to Wellborn after Brown's death." This court did not find the fact attempted to be quoted by appellant; it found that "the note to Wellborn, *including* the additional premium called for in the new policy, was paid to Wellborn after Brown's death," which is a distinct and different finding from that asserted by appellant.

Appellant also assigns that the court erred "in that part of the opinion * * * which seeks to analyze and apply a rule of law as laid down in the case of Kimbro v. Insurance Company, 99 Minn. 176, 108 N. W. 861, * * * because in that case there was nothing to be done by the insured except to receive the policy and the agent to deliver the policy. In fact, the company had delivered the policy when it mailed it." The wrong page number of the Kimbro Case was given in a portion of the opinion, and the Kilborn Case, 99 Minn. 176, 108 N. W. 861, was cited upon another point in a different portion of the opinion, and which holds the principle with reference to the mailing of the policy when the contract is fully executed and consummated. The Kimbro Case (Iowa) 108 N. W. 1025, 12 L. R. A. (N. S.) 421, attempted to be analyzed in our main opinion, was cited by us upon the question of implied power of the agent to consummate the contract of insurance, notwithstanding the secret instructions with reference to the signature by the insured to the new application requested by the company in its letter to the agent; and in support of the doctrine we further cite the following cases: Life Ins. Co. v. Findley, 29 Tex. Civ. App. 494, 68 S. W. 695; Insurance Co. v. Berwald (Civ. App.) 72 S. W. 436; Woodman v. Carrington, 41 Tex. Civ. App. 29, 90 S. W. 923; Insurance Co. v. Calvert (Civ. App.) 100 S. W. 1035; Ins. Co. v. Bowen (Civ. App.) 102 S. W. 167; Insurance Co. v. Owens (Civ. App.) 130 S. W. 963; Insurance Co. v. Ellis (Civ. App.) 137 S. W. 187.

We conclude that Wellborn, or Nelson, in his stead, intended to deliver the policy when the telephone conversation occurred upon Brown's acceptance, after an explanation made to him of the difference in the term, and the difference in the premium, between the policy applied for by him and the one forwarded by the company. The new application to be signed by Brown, as stated in the original opinion, was the same as the old application for the 15-year endowment—the inquiries being the same, and the answers of Brown adopted by the company. When Nelson explained this difference, without any statement with reference to any new application to be signed, with the only change as indicated, and Brown accepted the policy as changed, we think the minds of the parties met, and the policy and the old application constituted the contract. When the company, upon the application, rejected the 15-year endowment and reduced it to a 10-year endowment, Mr. Brothers, the secretary of the company, indorsed the old application, "Reissued, see No. 982," which latter was the number of the new policy.

[12] We do not think that the statutes on insurance avoid a policy where the company extends credit and receives an obligation of another as payment of the first premium, instead of cash. Article 4741, R. S. 1911, says that no policy of life insurance shall be is-

sued or delivered in this state unless the contract shall contain a provision substantially that all premiums shall be payable in advance, either at the home office of the company or to an agent of the company upon a delivery of the receipt signed by one or more of the officers who are designated in the policy, and required a further provision in the policy that the policy, or policy and application, shall constitute the entire contract between the parties. These provisions were in this policy. Article 4954 is a provision aimed at the prevention of insurance companies discriminating between insured of the same class and of equal expectation of life in the amount of payment of the premiums to be charged for such insurance; also stating that life insurance companies, or their agents, shall not make any contract of insurance or agreement other than as expressed in the policy issued thereon, providing for a punitive penalty by criminal prosecution and an additional penalty of forfeiture of its certificates of authority to do business in the state.

We are not prone to believe that the provisions of the statutes were intended to prevent an extension of credit, where insurance companies thought it expedient to do so, in payment of premiums for such contracts. The statutes do not say that all premiums shall be payable in advance "in cash," either at the home office or to the agent of the company, and in the business world extensions of credit are equivalent to cash. We are not inclined to think that these statutes contemplated a well-known method pursued by insurance companies was to be prohibited to them in the conduct of their business.

Again, if we are mistaken in this view, it is noted that article 4954, in prescribing that an insurance company or agent thereof shall not make a contract other than as expressed in the policy, does not declare that the policy of insurance shall be void. Article 4954 is in substance the same as the statutes of several states, prohibiting discrimination and rebates and containing the same clause with reference to the company, or the agent thereof, making only that contract of insurance as expressed in the policy, and the tendency and swing of the decisions, in so far as the question of rebate is concerned (the other question we are not able to find decided), is against the proposition that the policy is void. McNaughton v. Des Moines Life Ins. Co., 140 Wis. 214, 122 N. W. 765; Laun v. Pac. Mutual Life Ins. Co., 131 Wis. 555, 111 N. W. 660, 9 L. R. A. (N. S.) 1204; Rideout v. Mars, 99 Miss. 199, 54 South. 801, 35 L. R. A. (N. S.) 485, Ann. Cas. 1913D, 770.

Again, if we concede that the statute is a prohibition of the making of a contract for the payment of a premium by an obligation instead of by cash, the question, however, is akin to the principle applied by the Supreme Court of the United States, in construing Revised Statutes, § 5137 (U. S. Comp. St. 1901, p. 3460), an act of Congress which forbids a national bank to loan money upon real estate as security. It is not necessary to cite the repeated holdings of the Supreme Court of the United States with reference to this statute. As applicable here, however, the Supreme Court in the case of National Bank v. Whitney, 103 U. S. 99, 26 L. Ed. 443, said: "The statute did not declare such security void, but was silent on the subject; that had Congress so intended it would have been easy to say so, and it can hardly be presumed that this would not have been done, instead of leaving the question to be settled by the uncertain result of litigation and judicial decision."

Motion for rehearing overruled.

HUFF, C. J., not sitting.