QUANAH, A. & P. RY. CO. v. DICKEY.
(No. 794.)

(Court of Civil Appeals of Texas. Amarillo. June 5, 1915. On Motion for Rehearing, Oct. 9, 1915.)

1. ESTOPPEL ⚙️93—EQUITABLE ESTOPPEL—GROUNDS OF ESTOPPEL — PERMITTING EXPENDITURES.

An owner of property abutting on a street who has joined with other citizens in subscribing to a fund to provide a bonus to induce a railroad company to build a road, and who has agreed to secure permission from the city to operate tracks in the street upon which his property is situated and to procure a relinquishment of damages from abutting owners, is estopped from claiming damages due to the construction of the road.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 264–275; Dec. Dig. ⚙️93.]

2. SUBSCRIPTIONS ⚙️12 — CONSTRUCTION OF CONTRACT—SCOPE AND EXTENT OF LIABILITY.

A contract by a subscriber to a fund in aid of railway construction, whereby he agreed that if relinquishments of damages to abutting owners were not obtained, he would furnish a bond conditioned that the sureties should pay any judgment against the railway for damages, is an indemnity contract with an agreement for bond, under which the subscriber is jointly and severally liable primarily to the amount of his subscription for damages occasioned by the construction of the railway, and is enforceable by the latter, although the claims are not first reduced to judgment.

[Ed. Note.—For other cases, see Subscriptions, Cent. Dig. § 11; Dec. Dig. ⚙️12.]

3. SUBSCRIPTIONS ⚙️10 — ACCEPTANCE — ESTOPPEL.

Where the heading of a subscription list for a fund in aid of railway construction recited that a memorandum was attached which authorized trustees to enter into a contract with the railway relating to such construction, a subscriber will not be permitted to deny the contract, and that he knew of its terms, although the evidence is conflicting as to whether the memorandum was attached when the list was signed.

[Ed. Note.—For other cases, see Subscriptions, Cent. Dig. §§ 10, 23; Dec. Dig. ⚙️10.]

4. SUBSCRIPTIONS ⚙️18—JOINT CONTRACT—TERMINATION OF AUTHORITY.

Where the signer of a contract to raise a bonus for railway construction, and which authorized trustees to contract in the name of the subscribers with the railway to procure permission from the city to construct a road over certain streets and to procure relinquishments of damages, attempted to withdraw the sum subscribed by him, such act did not constitute a revocation of the power of the trustees to contract,

[Ed. Note.—For other cases, see Subscriptions, Cent. Dig. §§ 20, 21; Dec. Dig. ⚙️18.]

5. SUBSCRIPTIONS ⚙️18—REVOCATION—POWER COUPLED WITH INTEREST.

A subscription contract signed by numerous property holders, giving trustees power to contract with a railway to procure permission from the city for the construction of its lines and for relinquishment of damages, when accepted by the railroad, is not a naked power revocable at the subscriber's pleasure.

[Ed. Note.—For other cases, see Subscriptions, Cent. Dig. §§ 20, 21; Dec. Dig. ⚙️18.]

6. PRINCIPAL AND AGENT ⚙️34 — POWER COUPLED WITH INTEREST—REVOCATION,

Powers are irrevocable by the principal when they form part of an act deemed valuable in law, or which forms part of the contract and is a security for money or for the performance of any act deemed valuable.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 55; Dec. Dig. ⚙️34.]

7. EMINENT DOMAIN ⚙️295—DAMAGES—RELINQUISHMENT—NOTICE—BURDEN OF PROOF.

In an action by an abutting owner for damages due to construction of a railroad in the street, the burden was upon him to allege and prove that an instrument executed by his authority, constituting a relinquishment of damages, was revoked, and that the railroad had notice thereof.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. § 803; Dec. Dig. ⚙️295.]

8. EVIDENCE ⚙️67—PRESUMPTION—CONTINUATION OF AGENCY.

Where a power is shown to have existed, it will be presumed that it continues, and that third parties, without notice of a revocation thereof, are justified in so presuming.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 87, 88, 103; Dec. Dig. ⚙️67.]

Appeal from District Court, Hardeman County; J. A. Nabers, Judge.

---

⚙️For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Action by W. T. Dickey against the Quanah, Acme & Pacific Railway Company. Judgment for plaintiff, and defendant appeals. Reversed and rendered, and rehearing denied.

D. E. Decker, of Quanah, for appellant. Love, Channell & Fouts, of Houston, and W. T. Perkins, of Quanah, for appellee.

HUFF, C. J. Appellee, Dickey, brought suit against the appellant, the Quanah, Acme & Pacific Railway Company, for damages alleged to have been occasioned to his property abutting on a street in the town of Quanah, known as South Front street, by reason of the appellant constructing its road in the street and adjacent to his property, and in operating trains over the track so constructed. Appellant answered, setting up that the appellee had invited the railroad company to construct its road by certain contracts and instruments, the purport of which will be hereinafter set out, alleging that the contracts so made were executed by the agents and trustees of Dickey. Dickey, by supplemental petition, replied that they had no such right or power to so contract for him, and that he had revoked the power by demanding the money back which he had subscribed to be paid on a certain subscription contract, after he learned that the road was to be constructed upon the street near his property.

The facts upon which we base our opinion are, substantially, that the citizens of Quanah desired to procure the construction of a railway from the town of Quanah in a westerly direction 40 miles, and prepared a subscription contract as follows:

"In accordance with the annexed memoranda of contract, we, the subscribers hereto, constitute J. E. Ledbetter and J. B. Goodlett trustees to enter into contracts with the Acme, Red River & Northern Railroad Company, in accordance with said memoranda; and on demand by said trustees, promise to pay to them the said several sums set opposite our names; it being contemplated that said sums shall be payable as soon as the sum of $40,000 is subscribed and that one subscriber hereto is not responsible for the subscription of another,"

Signed by a great many citizens, among whom is:

"W. T. Dickey.....................$500.00"

The first provision of the memorandum contract, attached to the above subscription contract, is:

"This contract made this the —— day of October, A. D. 1908, by and between the Acme, Red River & Northern Railway Company, a corporation organized and chartered under the laws of Texas, and now operating a line of railway from Quanah to Acme, Texas, acting herein by its president, who is duly authorized to act in the premises, by its board of directors, hereinafter styled party of the first part, and J. B. Goodlett and J. E. Ledbetter, acting as trustees, for and in behalf of each and every person who has now or shall contribute to the funds by said trustee held for the purposes hereinafter stated, hereinafter styled parties of the second part," etc.

The contract states that $40,000 had been deposited with the trustees, and a sum sufficient to procure right of way for the railway company from Acme in a western direction, to the Hardeman and Cottle county boundary line and railway terminals in the town of Quanah, which is to be paid and furnished to the parties of the first part in consideration of the performance of the matters and things thereinafter set out. It is further stipulated that the railway company should obtain an amendment of its charter, changing its name to the Acme & Western Railway Company; and it is further stipulated that the railway would, in 18 months from the date thereof, perform its part of the contract.

It was further provided in said memoranda that the parties of the second part should procure, from the city council of Quanah for the railway, permission to construct and operate one main track and one side track in, upon, and along the street known as South Front street, from the Frisco track to the western terminus of said street.

Parties of the second part also agreed to furnish necessary abstracts to the property obtained for a roundhouse, machine shops, depot, etc.

The eighth provision is as follows:

"That parties of the second part will procure from such owners of property abutting on South Front street, a relinquishment from any damages that may result to such property occasioned by constructing and operating its railway and trains over and along said street."

They further agreed to pay $40,000 in cash to the railway when it had run its first train into its station, not less than 40 miles out of Quanah, in Cottle county.

On the 6th day of May, 1909, the city council passed an ordinance authorizing the construction and operation of a railway along the street mentioned in the contract. On the 26th day of February, 1909, the trustees, for the several subscribers, entered into a contract with the railway company, the first paragraph of which is substantially the same as quoted in the memorandum, except as to the name of the railway, reciting that the $40,000 had been deposited with the trustees, and agreeing to furnish the money for a right of way for a railway and obtain suitable property, designated in the contract, for a depot, freight depot, roundhouse, and terminal facilities, designating the property; and in the seventh provision that the parties of the second part will procure from each owner of property abutting on South Front street a relinquishment of any damages that may result to such property occasioned by constructing and operating trains in, over, and along said street from its yards to the Frisco railway. In the event the relinquishment cannot be obtained from property owners that the parties of the second part shall furnish the railway company a good and sufficient bond, signed by the citizens of Quanah, conditioned that said sureties should pay any judgment which should be obtained against said railway by abutting property owners, for damages which

may be occasioned by constructing and operating said railway.

The evidence shows, in this case, that the railway company substantially complied with its contract with reference to establishing its depot, etc., and the construction of the road within less than 12 months from the date of the contract. The contract was properly signed by the president of the road and attested by the secretary, and by the trustees, Ledbetter and Goodlett.

The evidence in this case shows that the Acme, Red River & Northern Railway Company was chartered the 12th day of July, 1902, and that it obtained an amendment of its charter the 28th day of January, 1909, changing the name of the corporation to Quanah, Acme & Pacific Railway Company. Charters were offered for the purpose of showing that the roads named are one and the same and that at the time the contract was made between the parties it was understood an amendment would be secured, changing the name of the corporation to the present one, Quanah, Acme & Pacific Railway Company.

The evidence is not clear at just what time the appellee, Dickey, signed the subscription contract. He says in one part of his testimony that it was 30 or 60 days before he executed his note to the bank. On the 19th day of December, 1908, Dickey executed his note to the Quanah National Bank for the sum of $500 due ·July 1, 1909. On that date Ledbetter, as trustee, gave a receipt to Dickey for the sum of $500, in which it is recited the sum was deposited with the trustees under the articles of agreement to be entered into by Goodlett and Ledbetter, with the railroad mentioned in the memorandum contract, and the money was to be refunded in the event the railway did not comply with its contract. Dickey testified that at the time he signed the contract he did not know that the road was to be constructed by his property on that street, and stated:

"When I learned that there was some talk or idea about locating the track along that street, I had a conversation with Mr. Ledbetter, the man I delivered this money to, about it. My understanding was that the location of the road was to be away along up here [indicating the west part of the city somewhere]. I finally went to Mr. Ledbetter and talked to him about the matter before it was finally determined to locate the railroad along that street by my property. I asked him to keep that note subject to where the road would be built; that if the road was built anywhere else except down that street, I would pay it, and if not I would not pay it, and he agreed to keep it and protect the note so it could not get out of his hands into some one else's hands until it could be determined where the road was to be built, and if it was down that street where it is now, I was not to pay it. If it was not built on some other street, but was built along that street by my property, I was to have my note back. After I had this agreement, about which I have testified, I subsequently learned of a determination to locate the road down that street by my property, and I then, or later on, tried to get my note back from Ledbetter."

At another place he said:

"I went to Ledbetter because he represented the committee. I went to him when I learned there was talk of a railroad being located down there on that street and told him if they decided to locate it down there my subscription did not go, I did not know at that time the railroad would go down that street. It had not been determined at that time where it would go. There was some talk about it. However, I wanted to make that condition. * * * After I found the railroad tracks were going to be located along that street, I never did go to any officer of the railway company and tell him I protested against it going there. I did not because I did not know anything about the officers of that company. I did not make any inquiry as to whom the officers were. I went to the committee—the one getting up this bonus —and they told me it was not yet completed; that only about half the bonus had been completed."

Mr. Ledbetter testified:

"It is a fact after this note was ·executed Dickey called my attention to the fact that there was some likelihood of the railroad being located where it is now, near his property, and he came to see me about the matter. I had a conversation with him at that time about the matter. I went with him and looked over the situation with reference to his property, and he instructed me, or requested me, at that time, not to deliver his note until the location of the road was determined; that if it was decided to locate the railroad on that street by his property, to return his note to him. That was about the substance of the matter."

Dickey further testified:

"The first notice I gave this defendant railroad that I did not want the track there was when I filed this suit."

From the facts in this case it is shown that no notice was given the railway company, or its officers, that Dickey had, in any way, revoked the authority of Ledbetter and Goodlett. It is shown that while the subscription list was not actually delivered to the railway company, its officers were aware of the signers' names on the list, and that W. T. Dickey had signed it and constituted Ledbetter and Goodlett as trustees, to make the contract with the road. Ledbetter was also president of the Quanah National Bank, and the note was made payable to that bank; and the money obtained on the note and placed with the trustees to hold under the contract with the railroad company. Dickey contends that he did not actually pay the note, but that he had some money on deposit with the bank, and afterwards that money was taken by the bank and applied on the note, and that he did not consent thereto.

The case was submitted to the jury upon special issues, and they found that the property, immediately before the construction of the railway, was worth $18,000 and immediately afterwards $16,000. They found that J. E. Ledbetter and J. B. Goodlett were authorized by plaintiff to contract with appellant company to construct a line of railway into the town of Quanah, and that Dickey signed the subscription list offered in evidence. They were unable to agree as to whether or not the memorandum contract

called for in the subscription list was attached to the subscription list at the time he signed it. They found also that Ledbetter and Goodlett executed the contract admitted in evidence; and they found that the company constructed its railway in conformity to the contract satisfactory to the committee, but not in letter.

Appellee Dickey further testified that he did not know whether the memorandum contract was attached to the subscription list at the time he signed it; that he could not say, as he did not see it, and if it was attached, he did not know it.

Harry Koch testified that he was present at the time Dickey signed the contract, and that the memorandum contract was attached at that time.

The court rendered judgment on motion of the appellee for $2,000 against the appellant. Appellant requested the court to instruct the jury peremptorily to find a verdict for it, and also made a motion to the court to render judgment on the findings of the jury for appellant, which motion the court overruled. This action of the court is assigned as error.

[1] We believe under the terms of the contract that Dickey is estopped to recover damages to his property as an abutting owner. He had, with his co-obligors, agreed in the memorandum contract to procure from the city permission for the railway to construct and operate one main track and one side track in and upon the street upon which his property was situated, from the Frisco track to the western terminus of the street. He further agreed to procure the owners abutting on the street to relinquish any damages that might result to the property, occasioned by the construction of the railway operating trains on and over the street. The city passed an ordinance authorizing the railway to construct and operate its railway on the street. The contract entered into by the trustees for appellee and his co-obligors has the same provision as the memorandum attached to the subscription contract with reference to obtaining relinquishments from abutting property owners. This was an invitation to the railway to build along that street, by appellee, under an agreement to obtain relinquishments for damages from the abutting owners. In effect, it amounted to a relinquishment on his part of the damages to his property. He is now, after so having induced the railway to build on the street, estopped from recovering damages therefor. Railway Co. v. Jarrell, 60 Tex. 267; Evans v. Railway Co., 9 Tex. Civ. App. 124, 28 S. W. 903; Railway Co. v. Adams, 58 Tex. 476, 482.

[2] Again, he agreed that if relinquishments were not obtained, he would furnish a bond that the sureties should pay any judgment which should be obtained against said railway by abutting property owners for damages which should be occasioned by constructing and operating said railway. This is clearly an indemnity contract, with the further agreement to give a bond guaranteeing the payment of any judgment rendered against the railway company. As an indemnitor, appellee was one of the joint obligors, and primarily liable for the damages occasioned by the construction of the railway. If the bondsmen had been forced to pay they could have looked to him as the primary obligor. His liability on the contract was joint and several; he was liable for the entire amount of the damages, with the right of contribution from his co-obligors. The fact that by the terms of the subscription his liability was only for an amount of the subscription, and not for that of others, will not defeat his joint obligation to procure a relinquishment of the damages, or secure the payment of them. Faires v. Cockerill (Civ. App.) 29 S. W. 669 (this case was reversed by the Supreme Court on another point, 88 Tex. 428, 31 S. W. 190, 639, 28 L. R. A. 528); Mateer v. Cockrill, 18 Tex. Civ. App. 391, 45 S. W. 751. We see no reason why the railway company may not enforce against appellee, as one of the indemnitors who indemnified it against damages, without first being compelled to reduce them to a certainty by judgment and then pay such damages out of his property and forced to sue the grantors and they in turn sue the indemnitors. Certainly if appellee has indemnified the road against such damages, there is no necessity for this circuity of route. Pope v. Hays, 19 Tex. 375; Croft v. Peck, 64 Tex. 627; Morton v. Lowell, 56 Tex. 643. Appellee sues appellant for damages he obligated himself to procure a release or to pay; he did neither. He induced appellant to inflict the damages, under an agreement to have them relinquished, or, if not, be obligated himself to pay them. The suit of appellee is based upon his own wrongful act and a breach of his obligation to relinquish the damages, or to pay them.

[3] Appellee contends that he did not know the railway was to be constructed on that street when he signed the subscription. The memorandum attached to the subscription so stated and instructed the named trustees to make the contract in the terms of the memorandum. It is contended the memorandum was not attached when appellee signed the subscription. His testimony is he did not see it, and if it was attached he did not know it. One of the parties who was present when he signed it testified positively the memorandum was attached. The heading for the subscription itself asserts it was attached, and constituted the named trustees as agents, with authority to enter into a contract in accordance with it. Under such circumstances, appellee will not be permitted to deny the

contract, or that the proposition was not his, and that he did not know of its terms. He does not allege or prove fraud or misrepresentation inducing him to so sign. It must therefore be held to be his contract, and that he authorized the trustees to execute the same, and who acted for him, as found by the jury. It is regarded by us as immaterial that the jury were unable to agree whether the memorandum was attached when appellee signed the subscription.

[4] Appellee pleaded that he revoked the power of the trustees to the contract for him, and so notified them. It will be noted from his testimony hereto set out that he told one of the trustees that he would not pay the $500 subscribed by him if the road was to be constructed on the street by his property. At the time he made this statement he had, some time previous, paid the money to the trustees. He had executed his note to the bank to obtain the money. In some portions of his testimony he demanded of Ledbetter, who was president of the bank, as well as one of the trustees named in the contract, to return his note, or to hold it until he ascertained definitely whether the road would be constructed. We do not find from the testimony that he anywhere revoked the power of the trustees to make the contract. We think it should be borne in mind that the trustees were invested with double power: One was to demand and collect the money subscribed and to pay the same over to the railway when it constructed according to its contract; the subscribers further authorized the trustees to contract in the name of the subscribers, with the railway, to procure a permit from the city to construct the road over the street and to procure a relinquishment of the damages occasioned thereby from the abutting owners and to hold the railway harmless from such damages. The appellee did not erase, or ask that his name be erased from, the instrument granting this power. He did not in terms revoke the power, but asked for his money back or for the return of his note. We find nothing from his testimony that he was unwilling that the trustees should contract to procure a relinquishment of the damages or indemnified the railway against them. His testimony is when he signed he did not know that the road was to be so constructed; he afterwards learned of it and was unwilling to pay $500 if it passed his property on the street, but the testimony fails to show he was unwilling to secure the railway company against the damages. He may have been willing to so secure the right on the street, but unwilling to pay in addition $500. The withdrawal of that sum subscribed did not necessarily revoke the power to the trustees for other purposes. It was understood that the money subscribed was not to be paid until the full $40,000 was subscribed. This appears to have been accomplished at least by December 19, 1908.

[5] However, there are facts in the record which would authorize the inference that the subscription was not completed until after appellee executed his note, December 19, 1908. On this date appellee executed his note to the bank to obtain the money, which he paid to the trustees and took a receipt therefor, to hold until the railway company complied with the terms of its contract. This subscription and memoranda contract we are inclined to believe amounted to a covenant between the co-obligors to secure the right over the street and indemnify the railway. The power given trustees, under circumstances of this case, indicates that it was not a mere naked power. There were rights of appellee's co-obligors to be considered and protected. We are clear, if the railway company had accepted the proposition, it was not a mere naked power which could be revoked at the will of the appellee. The testimony is not clear just when the railway accepted the proposition. The appellee says he learned that the road was to be constructed on the street after executing the note. The contract the trustees last made with the railway is dated February 26, 1909. Just when appellee gave the notice to Ledbetter is left to conjecture. We believe he should show that such notification was given before acceptance by the railway company. If he did not do so, then he cannot defeat estoppel or his contract by showing at some time he notified one of the trustees he would not pay the $500 and that it must be returned to him. Williams v. Rogan, 59 Tex. 438.

[6] This case presents a serious question whether, even before acceptance, the appellee could revoke the powers granted. The testimony would indicate, while not conclusive, that all the subscription was paid and in the hands of the trustees before the purported revocation. The power given the trustees was to secure the right of way and jointly for the signers to indemnify the railway company. The various subscribers must be understood to have mutually agreed with each other to secure such right, and selected a given agency to perform that work and contract to that end. Powers are held irrevocable by the principal when such powers form part of an act deemed valuable in law, or—

"which forms part of the contract and is a security for money or for the performance of any act which is deemed valuable." Hunt v. Rousmanier, 8 Wheat. 175, 5 L. Ed. 589; Mechem on Agency, vol. 1, §§ 570, 588, inc.; Chapman v. Bates, 61 N. J. Eq. 658, 47 Atl. 638, 88 Am. St. Rep. 459; Smith v. Railway, 115 Cal. 584, 47 Pac. 582, 35 L. R. A. 309, 56 Am. St. Rep. 119.

This was an agreement between the joint obligors, for their benefit, to secure the construction of the railway and the selection of joint trustees to contract and obtain specific property and obtain relinquishments, with the power vested in the trustees so to contract. Without intending to hold it as the

law that such powers so conferred were irrevocable by the principal, we nevertheless suggest the question, and refrain from holding that it in fact was such a power.

[7] In this case there is no plea or proof that notice was given to the railway that the powers of the trustees were revoked. While this is a special agency, we think, under the circumstances, the same rule should apply as to general agency. In this case appellee, in writing, specially authorized the trustees to make the contract; in other words, he in writing accredited the trustees to contract with the appellant. If the contract was not consummated at the time of the renunciation, appellee knew that the purported contract was on foot and had not yet been completed, and to permit the appellant to deal with the trustees without notice of the dissolution of the relationship would be unreasonable and unjust. He left in the hands of his agents a written power to execute a contract, in his behalf, prescribing the things to be agreed to. The appellant could reasonably conclude that the authority still continued and be thereby induced to act upon it. Appellee owed to appellant the duty to prevent that prejudice or injury.

The facts show, in this case, that the railroad entered into the contract with appellee and his co-obligors relying upon the fact that the trustees were empowered to make it by virtue of the written instruments, executed and yet in the hands of the trustees, unchanged or unaltered. Mechem on Agency, vol. 1, §§ 628–633, inc. We believe the burden was on the appellee to allege and prove that the instrument was not only revoked, but that appellant had notice of that fact. Appellant had set up the contract as a defense, alleging it had been made by the authority of appellee. The writings prove the contract and the power. It was alleged by virtue thereof the appellant made a contract and complied with its provisions by constructing and operating the road where and within the time stipulated. Our Supreme Court in this state has said:

"The rule of our law, as to the time when the revocation of an authority by the act of the principal takes effect, is equally clear, comprehensive, and just, As to the agent himself, it takes effect from the time when the revocation is made known to him, and as to third persons, when it is made known to them, and not before. And this the principal may do by making the revocation as notorious as the fact of agency was. Until it is thus made known the principal is bound by the acts of his agent done within the scope of his authority, upon the familiar principle that when one of two innocent persons must suffer, he shall suffer most who by his confidence, or silence, or conduct, has misled the other." Cleveland v. Williams, 29 Tex. 214, 94 Am. Dec. 274; Ins. Co. v. McKinnon, 59 Tex. 507; Amarillo, etc., v. Brown (Civ. App.) 166 S. W. 658.

[8] We think also, it being shown that the power existed at one time, the presumption should prevail that it continued, and that third parties without notice of a revocation were justified in so presuming and acting on the apparent unrevoked authority. We believe, under the facts of this case, the court should have given the requested peremptory instruction, and also should have sustained appellant's motion to render a judgment for it upon the findings of the jury. The facts, we do not think, as contended by appellee, uncontroverted that appellee revoked the authority of the trustees to contract. They go only to the extent of withdrawing the agreement to pay $500, as heretofore pointed out, and there are no facts showing that notice was given appellant of any changed relationship whatever, and that appellant acted upon such power without any notice of the change.

The judgment will be reversed, and here rendered, that appellee take nothing by this suit, and that appellant recover its costs in this court and in the court below.

HALL, J., not sitting.

## On Motion for Rehearing.

HUFF, C. J. It occurs to us appellee, in his motion for rehearing, overlooks the finding of the jury that Ledbetter and Goodlett executed the contract with appellant as trustee for appellee and others, and that appellee signed the subscription contract which empowered the trustees to act for him. The contract was therefore the contract of appellee. The jury, by their findings, substantially find the trustees were acting for appellee when they signed the contract as trustees and were authorized thereto by the subscription contract. They certainly would not have so found if the power had been revoked, as contended by appellee. After appellant set up the contract which induced it to construct the railway where it did, appellee, in order to meet this phase of the case, alleged a revocation, and we think it was necessary on the part of appellee to so allege and prove it. As pointed out in the original opinion, after having given the power to contract to the trustees, we believe the burden was on the appellee to show appellant had notice of such revocation before he can set aside the contract, apparently lawfully executed. The trial court refused to submit the issue, at the request of appellant, to the jury as to whether appellant had notice of the revocation before signing the contract. The trial court, in his explanation to the bill of exceptions explains that he refused the request because there was no evidence on that point. We believe all the evidence in this case of notice is that given to Ledbetter, who was appellee's agent and not appellant's. The answer of appellant sets out the terms of the contract, in which it is alleged that appellant was induced to construct a railway in the street thereby. In the original opinion we used the term "invited" instead of "induced," used by the pleadings. We think this contract entered into by the authority of appellee was suffi-

cient to estop him from recovering damages to his property abutting on the street, which the appellee and others agreed they would pay or cause to be relinquished.

Under the facts of this case and the findings of the jury, we think the trial court should have rendered judgment for appellant. We find no reason for changing our view, as expressed in the orignal opinion, and the motion will be overruled.

HALL, J., not sitting.