THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, Plaintiff, *v.* RUTH SNYDER and Others, Defendants.*

Supreme Court, New York County, November 9, 1928.

*Alexander & Green* and *Bailey & Weit* [*James H. McIntosh* and *Solon Weit* of counsel], for the plaintiff.

*Edgar F. Hazleton* and *Joseph Lonardo*, for the defendant.

MAHONEY, J. The plaintiff insurance company seeks to have declared null and void two insurance policies issued by it upon Albert E. Snyder during his lifetime. The defendant Josephine Brown is named as administratrix, etc., of Albert E. Snyder. The

---

* Affd., 229 App. Div. 852. Motion in Appellate Division for leave to appeal to Court of Appeals denied (230 App. Div. 812). Motion in Court of Appeals for leave to appeal to that court denied December 2, 1930.

defendant Ruth Snyder was the wife of Albert E. Snyder. The defendant Ruth L. Snyder is the assignee of the said Ruth Snyder of all her former right, title and interest in and to the said policies of life insurance in question. It is the claim of the plaintiff that when the two policies in question were issued on the life of Albert E. Snyder, the insured, there was no meeting of the minds, and hence, no contract of insurance. It is for that reason that the plaintiff seeks to have the policies declared invalid and of no force and effect.

The evidence indicates that one Ashfield, who testified at the trial in favor of the plaintiff, was an agent of the plaintiff for the limited purpose of soliciting applications for insurance. It was a part of his duties to collect premiums on industrial insurance in the territory assigned to him, which territory included the place of residence of Albert E. Snyder and Ruth Snyder, in Queens Village, Queens county. It was also part of his duties to solicit applications for insurance, both on the industrial and the ordinary insurance plan. He was compensated as such agent by the plaintiff, by a salary based upon the amount of industrial premiums he collected, and by a commission on the first premium and on renewal premiums on policies issued by the plaintiff upon applications secured by him. It was expressly agreed in his contract of employment that he should have no authority on behalf of the plaintiff to make, alter or discharge any policy contract, to extend the time for paying a premium, to waive forfeiture, to incur any liability on behalf of the plaintiff, or to allow the delivery of any policy unless the applicant was then in good health and the first premium paid in full. Ashfield had met the Snyders in connection with industrial insurance held by the family. In October, 1925, upon calling at the residence of the Snyders and meeting Ruth Snyder, the latter indicated a desire to take out a large policy of insurance upon her husband's life, and she asked the agent to talk with the husband to induce the latter to take out such policy. About October 30, 1925, Ashfield, Snyder and Mrs. Snyder had a conversation with respect to new insurance on Snyder's life. The agent explained to Snyder the various features of the different kinds of policies, particularly the features of the so-called modified life policy and the provisions of a policy providing for accidental death benefits and total and permanent disability benefits. He told Snyder of the benefits the policy would give in the event of the insured's accidental death and of his permanent or total disability, and he quoted rates to Snyder. Apparently, Snyder indicated at the time that he was not interested in any policy of any large size, and that the most he wanted was a policy of $1,000 on the endowment plan. He said he would take the endowment policy and think about the question of larger

insurance. As a result of this conversation, however, the agent took out of his pocket an application form, and filled in the blanks with the information the· blanks called for, and after filling it out for insurance on Snyder's life for $1,000 on the twenty-year endowment plan, with accidental death benefits, and total and permanent disability benefits, he gave it to Mr. Snyder and told him to sign it, and at the same time presented to Snyder for his signature another application blank. Apparently, Snyder imagined he was required to sign the first application in duplicate. At any rate, he signed both applications, one of which was blank. The agent took away with him both applications containing Snyder's signatures. In a short time the agent called on Mrs. Snyder, and there was apparently a discussion between them as to whether or not the blank application should be filled in for $25,000 or for $50,000 insurance. The agent advised her to take $50,000. After this conversation the agent filled in the blank application on which Snyder had placed his signature, copying the data for that purpose from the application for the $1,000 endowment insurance, for which Snyder had actually signed the application. The application as filled in by the agent was an application for $50,000 insurance on the modified life plan, with disability income and accidental death benefits. This paper which the agent so filled out is in evidence as plaintiff's Exhibit 3. There is no evidence in the case that Snyder ever knew that such application was made. After proper medical examination the application for $1,000 endowment insurance was approved and such policy issued. When the plaintiff acted on such application for $50,000 insurance, the evidence shows that it did not know the agent had filled it out as an application for insurance on Snyder's life for $50,000 on the modified life plan with accidental death benefits and disability income benefits, at the request and suggestion of Mrs. Snyder and not at the request and suggestion of Mr. Snyder, but apparently believed and acted on the belief that the application had been so filled out at the instance of Mr. Snyder. It was the plaintiff's rule and practice not to make out an insurance on any one life in excess of $50,000 which provided for both accidental death benefits and disability income benefits. If the plaintiff had accepted the application filled out by the agent, known as Exhibit 3, and it had become a contract of insurance, then Snyder would have been insured in the plaintiff for $50,000 insurance, all of which would have provided for accidental death benefits and disability income benefits, and the disability income under said policies would have been $520 monthly, whereas it was the plaintiff's rule to issue in no case policies providing for disability income more than $500

a month on any one life. The plaintiff, therefore, wrote up the two policies which are in controversy in this suit, one of them numbered 5237784, for $5,000 insurance on the modified life plan without accidental death benefits or disability income benefits, and the other, numbered 5237785, for $45,000 insurance on the modified life plan with accidental death benefits and disability income benefits. These two policies are in evidence as plaintiff's Exhibit 16 and plaintiff's Exhibit 17, respectively. At the same time the plaintiff wrote up policy No. 5237786, insuring Snyder's life for $1,000 on the twenty-year endowment plan for accidental death benefits and double indemnity benefits, which is in evidence as plaintiff's Exhibit 2. Attached to each of said policies numbered 5237784 and 5237785, the policies in suit, was plaintiff's form numbered 10164, said form as so attached being in duplicate and constituting in each policy one paper, but perforated so that one duplicate could be detached and sent to the home office. It will be noted that the policies for $45,000 and $5,000, respectively, as made out, were in form different from that applied for, for the reason that the $5,000 insurance on the modified plan was without accidental death benefits or disability income benefits. In other words, these two policies differed in some material respects from the insurance applied for in the application written by the agent. Form numbered 10164 reads as follows:

" REQUEST FOR AMENDMENT TO APPLICATION FOR INSURANCE
IN THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,

Incorporated under the laws of the State of New Jersey
Edward D. Duffield, President        Home Office, Newark, N. J.
" I Hereby Request The Prudential Insurance Company of America to amend my application for insurance, so that the Policy applied for may be issued in the amount of $5,000, and without accidental death benefit or disability income, and I agree that this amendment shall form part of said application and that a copy hereof shall be attached to the policy when issued, and further, that my acceptance of the Policy as issued shall constitute a ratification of the change hereby authorized.
"  . . . . . . . . . . . . . . . . . . . . . . . .
*"Applicant."*

The object of form No. 10164 was to amend the applicant's application for insurance so as to make his application when so amended call for the form and kind of policy that the plaintiff was willing to give him in cases where the company could not accept the application as made, but was willing to make an insurance contract with the applicant on some other basis. The Superin-

tendent of Insurance of the State of New York required the plaintiff to adopt and use such form numbered 10164 for such purpose, and the plaintiff had filed such form with the Superintendent of Insurance, who had approved the same.

Under date of November sixteenth, the plaintiff sent the policies in suit to its local office at Jamaica, and sent with them, addressed to the superintendent of that office, one H. R. Hyde, a letter of instructions, concluding the letter of instructions by saying: " Please see that amendment forms 10164 enclosed in the policies are signed in duplicate and the duplicates returned to the Ordinary Issue Department."

The Jamaica office received said applications in suit with the $1,000 endowment policy, showed the letter to the agent who wrote it, delivered the three policies to him to be handled by him pursuant to the plaintiff's rules and instructions in such cases. The agent, however, did not submit either policies in suit to Snyder. He never discussed further the subject of insurance with Snyder in any way, after the conversation with Snyder at his house on the evening of October 30, 1925. The agent, however, did detach from each policy in suit the duplicate of form 10164 and subscribed the name of Albert E. Snyder thereto, by tracing the name from the photostat copy of Snyder's name as it appeared on the photostat copy of his declarations made to the medical examiner, which was attached to each policy. The defendants produced on the trial the originals of said policies numbered 5237784–5. The duplicate of form 10164 attached to the policies has no sort of signature thereto, but is in blank.

After tracing the name of Albert A. Snyder on form 10164, which the agent detached from the policies, he then took said policies to Mrs. Snyder at her residence on or about November 24, 1925. He did not take them to Mr. Snyder because he was afraid Mr. Snyder would not accept the policies. He explained to Mrs. Snyder that there were two policies aggregating $50,000, instead of one for $50,000, and he told her that the $45,000 policy provided for accidental death benefits and disability benefits, and that the $5,000 policy did not. Mrs. Snyder was satisfied with the policies, paid the premiums thereon, and the agent left them with her. After Mrs. Snyder gave the agent her check for premiums on the policies, the agent turned the check into the Jamaica office in the regular course of business, and the check was duly paid when presented for payment. At the time at Mrs. Snyder's house that the agent gave her the policies, she asked the agent to send all the premium notices to her. The evidence shows that about nine or ten months before the death of Snyder, Mrs. Snyder asked the

postman to deliver all Prudential mail to her, and he complied with her request. In July, 1926, Mrs. Snyder rented a safe deposit box in the name of Ruth Brown, which was her maiden name, to which box she alone had access. She kept the policies in suit and the premium receipts in this box. Mrs. Snyder paid all the premiums on the policies in dispute by checks drawn by her on the joint bank account of her husband and herself. She paid them all to the agent except one, which was paid at the Jamaica office. On the night of March 20, 1927, Mrs. Snyder and her paramour, one Judd Gray, killed Albert E. Snyder. For this crime they were duly indicted, tried, convicted and sentenced to death.* I am satisfied from the evidence that plaintiff did not have any notice or knowledge of the fact that Snyder did not sign form 10164, plaintiff's Exhibits 12 and 13, until April 9, 1927, nor until such date did the plaintiff have any notice or knowledge of the fact that the agent had never had any talk about insurance with Snyder after the talk on the evening of October 30, 1925; I am satisfied that the plaintiff never had any notice or knowledge that the agent gave the policies to Mrs. Snyder until April 9, 1927, and until such date plaintiff never had any notice or knowledge that form 10164, attached to each of the policies in suit, had not been presented to or signed by Snyder. Ruth Snyder, the wife of Albert E. Snyder, was named as beneficiary in each of the policies in suit. On June 6, 1927, plaintiff duly notified Ruth Snyder that said policies and each of them never had any existence as contracts of insurance, and that the plaintiff repudiated the same. It then and there tendered to her all sums received by the plaintiff in connection with such policies with six per cent interest, aggregating $1,652.28, but she refused to receive such sum. At the trial such sum was tendered again and paid into court. On October 17, 1927, Ruth Snyder assigned to the defendant Ruth L. Snyder, her daughter, all her right, title and interest in and to said policies. It is, therefore, the main claim of the plaintiff in this case that there was no meeting of the minds between the plaintiff and Albert E. Snyder with respect to the policies in controversy in this suit. The defendants, on the other hand, claim that there was a full meeting of the minds and that contracts of insurance were duly entered into, and that the policies in question are now valid and binding contracts. The defendants also claim that if the agent acted without the apparent scope of his authority, at any rate that there was a sufficient ratification of his acts by virtue of issuance of insurance policies, accepting premiums, the mailing of notices to the insured, and other acts on the part of the plaintiff. Although the court understands that at the murder trial the prosecution sought to show that the policies in controversy

---

* See *People* v. *Snyder and Gray* (246 N. Y. 491).

constituted a motive for the murder, I am required to find that there is no evidence that Ruth Snyder had an improper motive in her endeavor to secure larger insurance upon her husband's life. Furthermore, the plaintiff in no way attempted to establish at the trial that the policies were fraudulently obtained, in that the defendant Ruth Snyder had in mind an improper motive. Practically the sole question to be decided in this case is whether or not there was a meeting of the minds, and if so, was a valid contract of insurance entered into which binds plaintiff insurance company. There is no evidence in the case as to what talk there might have been between the defendant Snyder and her husband with respect to insurance at any time after Snyder signed in blank the application for insurance at the request of the agent. There is no evidence that Snyder authorized his wife or failed to authorize his wife to proceed further in obtaining larger insurance upon his life. Snyder is dead. The defendant Snyder is dead; and apparently there was no examination before trial of defendant Ruth Snyder before she paid the penalty imposed by law. It is apparent, however, that the agent had no discussion with Snyder at any time with respect to insurance after Snyder's signature had been obtained on the blank application of insurance. The evidence indicates clearly that the exact kind of insurance called for in that application as filled in by the agent, and the amount therein specified, was not granted by the company, as heretofore noted. The policies in controversy indicate one for $45,000, providing for accidental death benefits and disability income benefits, and one for $5,000, not providing such benefits. There is no evidence that Snyder ever saw the policies which are the subject-matter of this suit. The evidence indicates that the " necessity for amendment " to the application was never called to his attention by the agent. I am required to find that the agent signed Snyder's name to the " Request for Amendment to Application " without in any way calling Snyder's attention to the fact that his signature to the amendment was necessary. It is clear that the agent forged Snyder's name and committed an improper and illegal act in so doing. In view of all these circumstances, can it be said that there was such a meeting of the minds from which there can now be spelled out a valid contract of insurance binding upon the plaintiff company? I am constrained to reach the conclusion that there was not, and in reaching such conclusion I am assuming the validity of Snyder's application for the said $50,000 of insurance. An application for insurance is not a contract. It is at most only a proposal to contract on certain terms which the insurance company is at perfect liberty to accept or reject. In this case apparently the insurance

company rejected the application as made, and submitted a counter-proposal which required acceptance by the insured.

"An application for life insurance is not a contract. It is only a proposal to contract on certain terms which the company to which it is presented is at perfect liberty to accept or reject. It does not in any way bind the company to accept the risk proposed, to make the contract requested, or to issue a policy." (*Travis* v. *Nederland Ins. Co.*, 104 Fed. 486.)

" The application for insurance is a *mere proposal* on the part of the applicant. When the insurer *signifies his acceptance* of it to the proposer (and not before), the minds of the parties meet and the contract is made." (*Heiman* v. *Ins. Co.*, 17 Minn. 153.) To similar effect see *Mut. Life Ins. Co.* v. *Young* (23 Wall. 85).

The form 10164, being the request for amendment to application, is in the form approved by the State Insurance Department. Apparently such a form was also required by the State Insurance Department in order that the policies, when issued, shall constitute the entire contract between the parties. Furthermore, in this case the policies with the application would constitute the entire contract between the parties, if valid. It is clear that each policy as issued was inconsistent with the application, and that there could possibly be no contract unless the assured, that is, the applicant, had accepted the amended form of insurance. In view of the evidence before me it seems clear that if Snyder had lived, he could, with good reason, have declared that the policies were not binding upon him for non-acceptance by him of the amended forms of insurance. Plaintiff company now has a similar and mutual right.

The defendants, however, claim that there was at least ratification of the issuance of the policies. Such a point was indicated during the trial, and particularly at the close of the trial. It is difficult, however, to establish ratification, without showing full knowledge of the facts on the part of the plaintiff, and there is no evidence in the case that the plaintiff knew of all the facts until after Snyder's death, when it almost immediately made a tender of premiums paid to defendant Ruth Snyder.

" It is well settled that in order to ratify an unauthorized act of an agent, the principal must have full knowledge of all the circumstances, and that unless this full knowledge exists, mere acquiescence will not constitute ratification of the agent's conduct." (*Hallow* v. *Hallow*, 200 App. Div. 642.)

" A principal may ratify the unauthorized act of an assumed agent only with full knowledge of the material facts so that it can be said he intended to ratify the act." (*Farmers Fund, Inc.*, v. *Tooker*, 207 App. Div. 37.)

If the ratification took place it must have taken place before Snyder's death, because it is clear that there could be no ratification after death. In other words, if the minds of the parties did not meet in Snyder's lifetime, they could not meet after his death. I am satisfied further that there was no estoppel of any kind, and the evidence fairly establishes that when plaintiff disavowed the unlawful acts of its agent and realized that there never could have been any meeting of the minds between it and Snyder, it offered to give up all it got in connection with the transaction, with legal interest from the date it received it. A case very similar to the case at bar is that of *New York Life Ins. Co.* v. *Manning* (156 App. Div. 818; affd., without opinion, 213 N. Y. 665). In that case the New York Life Insurance Company brought suit to annul an outstanding alleged policy, claiming that said policy never became a contract and never had any force and effect as insurance on the life of one Charles Nicchia. In that case Nicchia actually signed and made application for $5,000 insurance on his life. The New York Life Insurance Company approved the application, forwarded the policy as applied for on August 26, 1925, and the agent left it with Nicchia, who had it in his possession for five weeks, but did not as yet make up his mind whether he would accept and pay the premium. There is no evidence that the insured Snyder ever had the policies issued on his life in his possession, and the evidence would seem to indicate that Snyder died without knowing of their existence. Nicchia never accepted the policy until more than two and a half years after he applied for it and until after the company had treated the policy as valid and in force. The premiums had been paid by the agent, Moore, without any authorization from anybody. The agent in that case admitted to the plaintiff's attorney therein that the premium was never paid by Nicchia, and that Nicchia had never promised to pay the premium or to accept the policy. The case of Nicchia was tried before Mr. Justice LEHMAN. The plaintiff insurance company was successful, and the policy on the life of Nicchia was declared null and void. The decision of Mr. Justice LEHMAN was affirmed upon his opinion (156 App. Div. 818; 213 N. Y. 665). I, therefore, reach the conclusion that the policies in controversy never took effect as a matter of law, and that the same are now null and void.

Findings as submitted have been passed upon.

Submit decision and judgment.